**David TATRO, Plaintiff–Appellant,**

v.

**Timothy KERVIN, et al., Defendants– Appellees.**

**No. 94–1046.**

United States Court of Appeals, First Circuit.

Heard June 7, 1994.

Decided Dec. 1, 1994.

---

Sarah R. Wunsch, with whom Massachusetts Civ. Liberties Union Foundation and Chrystal Murray, Boston, MA, were on brief, for appellant.

Kevin S. McDermott, Asst. Corp. Counsel, with whom Albert W. Wallis, Corp. Counsel, City of Boston Law Department, Boston, MA, was on brief, for appellees.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and CARTER,* District Judge.

TORRUELLA, Chief Judge.

In this appeal, plaintiff-appellant David Tatro seeks a new trial for his civil rights action against three Boston police officers on the ground that the verdict for the defendants was based on erroneous jury instructions. While we agree that the trial court erred in instructing the jury that plaintiffs had to prove that defendant police officers "clearly" lacked probable cause to arrest and "clearly" used excessive force in that arrest, we find the error to be prejudicial only as to part of

* Of the District of Maine, sitting by designation.

the verdict, and harmless as to the rest. We therefore affirm in part and reverse in part.

## I. BACKGROUND

In September of 1992, Tatro brought suit against Boston Police Officers Timothy Kervin, Stephen O'Brien, and Stephen Chin, alleging that the officers arrested Tatro twice without probable cause, used excessive force in making one of the arrests, and interfered with Tatro's First Amendment rights, in violation of federal and Massachusetts civil rights laws, 42 U.S.C. § 1983, and Mass. Gen.L. ch. 12, §§ 11H & I, respectively. Tatro also raised pendent state claims.

The series of events that are the subject of this action occurred after police responded to complaints about a Halloween party on the night of October 31, and the early morning of November 1, 1989, at 27 Seattle Street in a neighborhood of Allston, Massachusetts. Either Officer Kervin or Officer O'Brien arrested Tatro on the sidewalk outside of the house on Seattle Street where the party was being held during an apparently violent and chaotic effort to break up the festivities. Following Tatro's release from the police station a few hours later, Tatro either intentionally or accidentally knocked over Officer Chin and was arrested a second time. Tatro alleges that both arrests were made without probable cause and that the second arrest was made with excessive force.

Tatro and the police officers presented two dramatically different versions of these events at trial.

### A. Tatro's Version

Tatro testified that he was standing outside 27 Seattle Street where the party was held when he saw some Boston police officers arrive, enter the house, order everyone to leave, and then violently arrest the party's host after he questioned the officers' right to enter the house without a warrant. As more police officers arrived, Tatro claims he exited the yard in front of the house, walked out the front gate, and then stood on the sidewalk on the other side of the fence enclosing the yard. Tatro testified that many of the party-goers came into the yard and began asking the police officers what the problem was. Tatro then saw the officers hitting people with their nightsticks and flashlights. Tatro stated he was "horrified" and that he stayed to watch the scene because he felt it was his duty to witness the incident of police brutality. On cross-examination, Tatro characterized the scene as a "riot."

According to Tatro, Officer Kervin suddenly approached Tatro and said, "Get the fuck out of here," at which point Tatro claims he turned toward Kervin and said "I can't believe what is happening." Tatro testified that Kervin then grabbed him by the arms and said, "You didn't move fast enough." The police then put Tatro in handcuffs, placed him in a police cruiser, and drove him to the police station.

After being held at the station for three hours, the police released Tatro. Subsequently, Tatro, several other partygoers who had been arrested, and their friends, congregated on the sidewalk outside the police station. Police officers then came out of the station and told them to leave. According to Tatro, he decided to walk home and, as he stepped off a curb, he accidentally walked into Officer Chin. Tatro claims he was looking down at the time because he had a vision disability and needed to watch his feet as he stepped off the curb. Officer Chin grabbed Tatro and then released him. Tatro asserts that Officer Kervin then tackled him from behind, ground Tatro's face into the pavement, grabbed him by the hair, pulled his arm way up behind his back, and said, "I've got you now, fucker." Officer Kervin then pulled Tatro to his feet, handcuffed him, and arrested him a second time.

Tatro suffers from a hereditary eye disorder which renders him legally blind. He carries an ID card attesting to his eyesight condition. Tatro told Officers Kervin and Chin that he was legally blind and he had not seen Officer Chin before running into him. He repeatedly asked the officers to look in his wallet for the ID card that would prove his near blindness, but the officers refused.

Tatro was charged with assault and battery on four different police officers, disorderly conduct, and disturbing the peace. Tatro was also charged with assault and battery

on Officer Chin outside the police station. All charges were ultimately dismissed.

### B. *The Police Officers' Version*

The officers and their witnesses provided an entirely different account of the events surrounding Tatro's arrests. According to the police officers, they were originally dispatched to 27 Seattle Street in Allston in response to neighbors' complaints of noise from the party. Several officers testified that the partygoers were uncooperative and initiated physical contact with the officers, after which a riot broke out.

Several officers and witnesses testified that Officers Kervin, O'Brien and some other police officers were trying to subdue and arrest another person when Tatro came from the sidewalk and struck one of the officers in the back. Tatro allegedly continued to strike several of the officers while they were handcuffing the other partygoer. Officer Kervin himself never said anything to Tatro and did not make the arrest of Tatro. Officer O'Brien testified that after securing the arrest of the other person, during which Tatro punched him, he grabbed Tatro and arrested him.

As for the second arrest, the officers claimed Tatro deliberately knocked Officer Chin down from behind, after walking directly toward Officer Chin. The officers testified that Officer Kervin then pulled Tatro off Officer Chin. Officer Kervin stated that he did not arrest Tatro nor initially take Tatro into custody at that point, rather his only action was to pull Tatro off of Officer Chin. The officers refused to look at the ID in Tatro's wallet showing that Tatro was legally blind because there was no doubt in their minds that Tatro deliberately and violently pushed Officer Chin.

### C. *Jury Instructions*

At trial, the court gave a number of instructions to the jury which Tatro claims were erroneous. Among those instructions are the ones concerning whether the officers had probable cause to arrest Tatro and whether the officers used excessive force. In its preliminary instructions, the court told the jury that in order for Tatro to prove that

the police officers arrested Tatro without probable cause, in violation of Tatro's civil rights:

> Tatro has to prove that it would be *clear* to the reasonable police officer, the reasonably well-trained police officer, that that reasonably well-trained police officer exercising reasonable, good judgment, would know that he didn't have probable cause to arrest this individual. (emphasis added).

In the actual charge to the jury, the court stated:

> Now, even if there was not probable cause in order for there to be a constitutional violation, it must appear *clearly* to that reasonable police officer that no probable cause exists for the arrest. Police officers are not to be held to the standards of lawyers or judges in the quiet of the courtroom. Police officers are out on the streets engaged in public affairs in the discharge of their duty.

> So, with respect to this first aspect of the federal civil rights claim, and it applies to both arrests, you must ask yourself whether Mr. Tatro has proved that *clearly* there was not probable cause for his arrest.

.     .     .     .     .

> . . . that he was seized *clearly* without probable cause as judged through the eyes of a reasonable police officer. (emphasis added).

With respect to the court's instructions on Tatro's claim of excessive force, the court stated before trial:

> [The police] don't have the right to use *clearly* more force, *clearly* more force than is required under the circumstances to take the person into custody. Mr. Tatro says that's what the three officers did here; they used excessive force in accomplishing the arrest.

> So now on this claim, here's what Mr. Tatro has to prove. . . . [W]as the force so *clearly* excessive, again, that a reasonable police officer faced by the same or similar circumstances, would have known, would have known, allowing now for a range of judgment, about what's required in an unfolding situation, the reasonable police offi-

cer faced by that same situation would have known this force is *clearly* excessive. To do this, it's *clearly* too much force than what we need to take the person into custody. (emphasis added).

In the final instructions, the court repeated that the police "could not use *clearly* excessive force, that is, *clearly* more force than was justified under all the circumstances." (emphasis added).

## II. ANALYSIS

### A. *Probable Cause and Excessive Force Instructions*

■ We review allegedly erroneous jury instructions *de novo* to determine if the instructions, taken as a whole, show a tendency to confuse or mislead the jury with respect to the applicable principles of law. *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir.1992); *Aubin v. Fudala*, 782 F.2d 280, 283 (1st Cir.1983). An erroneous instruction will require a new trial only if the error was prejudicial, based on the record as a whole; we will not reverse a judgment if we find the error from the proffered instructions to be harmless. *Davet*, 973 F.2d at 26.

■ The court's instructions on probable cause and excessive force were erroneous. In a civil rights action under § 1983, the plaintiff must prove *by a preponderance of the evidence* that he or she was deprived of a right secured by the Constitution by a person acting under the color of state law. *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). In the present case, Tatro had to prove by a preponderance of the evidence that the police officers violated his Fourth Amendment rights by arresting him without probable cause, *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir.1989), and by using excessive force in their second arrest of Tatro. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Initially, the court gave the appropriate instructions regarding the meaning of probable cause and excessive force. The court stated that "probable cause exists if the facts and circumstances known to the officer are sufficient to warrant a reasonable police offi-

cer in believing that the suspect has or is committing a crime." *See Santiago*, 891 F.2d at 384; *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987). In the instructions on excessive force, the court properly explained that the officers "could only arrest using the appropriate and reasonable degree of force under the circumstances of the case." *See Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1871–72; *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 205 (1st Cir.1990), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991). The court also quoted the Supreme Court's "calculus of reasonableness" from *Graham v. Connor*, which includes consideration of a police officer's need to make split second decisions in situations that might involve potential threats to public safety, or that might require the officer to subdue a perpetrator of a serious or violent crime. *Id.*

The court then further instructed the jury that, in order to prove his case, Tatro had to establish that the elements, as described above, were "clearly" evident to a reasonable police officer. Indeed, the court explicitly told the jury that finding lack of probable cause to arrest, and the use of excessive force, was not sufficient to find for Tatro unless they found that the arrest was made *clearly* without probable cause, and *clearly* with excessive force. The court explained to Tatro's counsel upon counsel's objection that it was embellishing the traditional language because "I think this is how qualified immunity, if you will survives." The court added:

> I don't think we put to the jury the issue of qualified immunity, but that concept survives. And I think it survives in this guise. It's not simply the question whether there was probable cause or not. It's, the question is whether the reasonable police officer would know that there was not probable cause and went ahead anyway and arrested him.

The court responded similarly after Tatro's counsel objected to the "clearly with excessive force" instruction: "[T]his is how they get their benefit, if you will, of qualified immunity. It has to be clear to the officers that what they're doing is not authorized by the situation."

It is not evident to us whether the court envisioned its instructions as a way to send some component of the qualified immunity defense to the jury, or merely as a way to effectively describe the "calculus of reasonableness" for the jury's benefit. Regardless of the court's reasons, the extra language may have erroneously misled the jury, and was not otherwise required by the facts or law of the case.

■ The court's persistent use of "clearly without probable cause" and "clearly excessive" force was erroneous because it tended to mislead the jury into believing that Tatro faced a heightened burden of proof with respect to these elements of his claim under § 1983. "Clear" has been defined as "[o]bvious beyond reasonable doubt," and "clear and convincing proof" has been described as "proof beyond a reasonable, i.e., a well-founded doubt" or else as "more than a preponderance but less than is required in a criminal case." *Black's Law Dictionary* 227 (5th ed. 1979). The court correctly provided the jury with a description of the preponderance of the evidence standard and instructed them generally that this was Tatro's burden of proof. The repeated and emphasized use of "clearly" with respect to the probable cause and excessive force elements of Tatro's action, however, transformed Tatro's burden of proof for those elements into something that sounded like the stricter "clear and convincing" standard of proof used in certain fraud and breach of fiduciary duty actions. *See e.g., Putnam Resources v. Pateman,* 958 F.2d 448, 468 n. 22 (1st Cir.1992); *Burdett v. Miller,* 957 F.2d 1375, 1382 (7th Cir.1992). Thus, instead of thinking they could find for Tatro if they determined it was more likely than not that a reasonable police officer would not have believed Tatro was committing an offense, the jury may have been misled into believing that it had to find by clear and convincing evidence that a reasonable officer would not have believed Tatro was committing an offense. This was error.

■ If the court was placing some element of qualified immunity into the jury instructions, this was not the proper time or manner to do it. Qualified immunity, which is a question of law, is an issue that is appropriately decided by the court during the early stages of the proceedings and should not be decided by the jury. *Hunter v. Bryant,* 502 U.S. 224, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Whiting v. Kirk,* 960 F.2d 248, 250 (1st Cir.1992); *Lewis v. Kendrick,* 944 F.2d 949, 953 (1st Cir.1991); *Hall v. Ochs,* 817 F.2d 920, 925 (1st Cir. 1987); *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). The language of the court's instructions and the court's explanation for that language appear very similar to the standard for qualified immunity. *Hunter v. Bryant,* 502 U.S. at ——, 112 S.Ct. at 536 (qualified immunity shields police officers from suit if " 'a reasonable officer could have believed [plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed' " or if the officers " 'reasonably but mistakenly conclude that probable cause is present.' ") (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)); *see also Rivera v. Murphy,* 979 F.2d 259, 263 (1st Cir.1992); *Hall v. Ochs,* 817 F.2d at 924; *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985). The police officers did not raise a qualified immunity defense and both parties agree that, given the facts of the case, no qualified immunity issue exists. Under such circumstances, we see no reason why Tatro must prove, as an additional element, the *absence* of qualified immunity.

In any event, if a court does feel obligated to give the defendants the benefit of qualified immunity at the final stage of the trial, or, more appropriately, if it needs to resolve factual issues related to qualified immunity, *see Prokey v. Watkins,* 942 F.2d 67, 73–74 & n. 7 (1st Cir.1991) (noting that some factual disputes concerning qualified immunity may need to be resolved by the appropriate fact-finder, although the ultimate issue of qualified immunity remains with the court), it must do so without using potentially misleading language like the "clearly" language used in the present jury instructions.

■ Similarly, if, as the police officers argue, the court was merely using the special language in its instructions to better explain and describe the calculus of reasonableness to the jury, and not to add additional ele-

ments of the offense or requirements of proof, the court did so in a way that tended to mislead the jury. As such, the instructions were erroneous. Although determining "reasonableness" is a fact-sensitive determination that would greatly benefit from some illustrative explanation, and although the jury must take into account the difficult situations in which police officers often find themselves, these considerations can be conveyed to the jury without possibly misleading them into thinking a heightened standard of proof applies to their deliberations. *See Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1871–72 (providing helpful description of reasonableness without using "clearly" language).

## B. *The Riot Statute Instructions*

■ Tatro also argues that a third instruction prejudiced him, because when taken together with the "clearly" language, the instructions would allow the jury to both believe Tatro's version of events as to the first arrest, and at the same time find for the police officers as to probable cause because of the misleading instructions on the standard of proof. This allegedly erroneous instruction involved the Massachusetts "riot statute," Mass.Gen.L. ch. 269, § 1.[1] The court instructed:

[I]f a reasonable police officer would have probable cause to believe that he was facing a riot and Mr. Tatro refused to leave after a lawful order to disperse, then Mr. Tatro was liable to arrest.

Over Tatro's vigorous objection, the court insisted on giving this instruction so that, under Tatro's version of the first arrest, the jury could determine whether Tatro violated the riot statute by refusing to leave the "riotous" party after Officer Kervin told him to "get out of here," thus giving Officer Kervin probable cause to arrest Tatro. Tatro argues that because the police officers explicitly asserted that they arrested Tatro because he assaulted them, the riot instruction

did not apply to the facts of the case, and, anyway, would be unconstitutional if applied to Tatro's version of events. Analyzing the riot statute instructions standing alone, we disagree with both of these contentions, and address them separately.

First, Tatro himself characterized the scene of his first arrest as a "riot," and stated that he did not comply when he was ordered by police officers to leave the scene. Tatro testified that he was arrested for "not leaving fast enough," and he encouraged the jury to disbelieve the police officers' version of the events. Contrary to Tatro's argument that "there is no evidence in the record upon which a jury could determine that Tatro was arrested for failing to leave the scene of a riot after receiving a lawful order to disperse," Tatro himself placed such evidence in the record, through his own testimony. If the jury believed Tatro's version of events, it could reasonably have found that Tatro was arrested for failing to comply with the officers' orders to disperse. We see no reason why the court could not properly invite the jury to find that, even according to Tatro's version of events, the officers may have had probable cause under the riot statute to arrest Tatro. Accordingly, we find that the court's decision *sua sponte* to issue the riot statute instruction was not erroneous.

■ Second, application of the riot statute to Tatro's version of events does not violate his First Amendment rights. In relating his version of the events, Tatro himself testified that he was arrested for "not moving fast enough," and not for any statements he allegedly made to Officer Kervin. In its instructions to the jury, the court specifically and thoroughly stated that *even if* Officer Kervin had probable cause to arrest Tatro, if the jury found that Officer Kervin's real reason for the arrest was to interfere with or prevent Tatro's statements, or otherwise "chill" his First Amendment rights, then Officer Kervin would be liable. Heard together with

1. Mass.Gen.L. ch. 269 § 1 provides in pertinent part:

    If ... ten or more persons, whether armed or not, are unlawfully, riotously, or tumultuously assembled in a city or town, ... the police ... shall go among the persons so assembled, ...

and in the name of the commonwealth command all persons so assembled immediately and peaceably to disperse; and if they do no thereupon immediately and peaceably disperse, each of said ... officers shall ... arrest[] such persons.

the court's riot statute instructions, these charges allowed the jury to find probable cause under the riot statute based on Tatro's alleged failure to comply with the officers' orders to disperse, yet also allow the jury to find the officers liable if it found that the officers violated Tatro's First Amendment rights.[2] Thus, these instructions were proper, and sufficient to prevent any possible misapplication of the riot statute by the jury.[3]

### C. *Effect of Instructions Reviewed as a Whole*

Having found that the jury instructions regarding Tatro's burden of proof were erroneous, we must next determine if that error prejudiced Tatro's ability to obtain a fair trial or was merely harmless. Because the jury delivered separate verdicts as to each of the two arrests, we analyze the effect of the instructions on each arrest separately, in reverse chronological order.

### 1. The second arrest outside the police station.

The two dramatically conflicting versions of the events regarding the second arrest in front of the police station required the jury to ascribe to either one version or the other. If the jury believed that Tatro deliberately pushed Officer Chin before the second arrest, there was probable cause to arrest him, and the confusing jury instructions would have had no bearing on this inevitable finding. If, on the other hand, the jury believed Tatro that the second arrest was made after he accidentally bumped into Officer Chin, and after the officers refused to verify Tatro's eyesight condition, the lack of probable cause is undisputable, because Tatro did not deliberately push Officer Chin and the officers failed to ascertain the reason for the accidental contact as the Constitution

requires them to do. *See Sevigny v. Dicksey*, 846 F.2d 953, 957 n. 5 (4th Cir.1988); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986). The jury was explicitly instructed of this Constitutional requirement, so if they did not believe the officers that Tatro deliberately pushed Officer Chin, there would be no basis to find probable cause to arrest, regardless of whether it was judged according to the preponderance of the evidence standard or erroneously through the clear and convincing standard. If the jury had believed Tatro, they would have arrived at a different verdict as to the second arrest, the erroneous instructions notwithstanding. Under these circumstances, the erroneous instructions are necessarily harmless and did not prejudice Tatro.

The diametrically opposed versions of Officer Kervin's alleged use of excessive force during the second arrest similarly rendered the effect of the erroneous instruction harmless as to Tatro's excessive force claim. Officer Kervin claimed he never arrested Tatro or took him into custody, let alone tackle Tatro, grind his face into the pavement, or grab him by the hair. Tatro's version, if believed, would have Kervin doing all these brutal acts without *any* justification whatsoever. The police officers admitted that Tatro did not resist arrest, fight back, or try to run away after he pushed Officer Chin. There was no middle ground in which the jury could have believed all or part of Tatro's version yet still rendered a verdict for the police officers. In sum, a heightened standard of proof would not have led to a mistaken verdict for the police officers, and thus Tatro did not suffer from prejudicial error regarding his claims as to the second arrest.

### 2. The first arrest at 27 Seattle Street.

As noted above, Tatro contends that the riot statute instruction, taken together

---

**2.** We reject Tatro's contention that the application of the riot statute to him raises overbreadth problems under the First Amendment. As we explained, the court's careful instructions delineate the riot statute's limits in justifying the officers' conduct. Thus, the instructions as a whole sufficiently prevent an unconstitutional interpretation or application of the statute.

**3.** This analysis assumes *arguendo*, of course, that the jury believed Tatro's testimony and disbelieved the officers' testimony. If, on the other hand, the jury disbelieved Tatro and found that he actually assaulted the officers, then they did not believe that the events leading to the violation of the riot statute ever occurred. Thus, there would be no prejudice to Tatro from the instructions, and his riot statute and First Amendment arguments would become moot.

with the erroneous instructions on the standard of proof, unfairly prejudiced him, as it would allow the jury to both believe Tatro's version of events and still find for the police officers because of the erroneous heightened standard of proof. We agree.

Although the riot statute instruction, standing alone, was proper, when taken together with the erroneous "clearly" language, the jury charge reviewed as a whole could well have prejudiced the plaintiff as to the first arrest. Unlike the case of the second arrest, it is not altogether obvious that the jury necessarily believed the defendants regarding the first arrest. The jury could have believed all or part of Tatro's testimony, yet still found the defendants not liable because 1) the riot statute gave them probable cause to arrest, *and* 2) Tatro failed to meet the heightened burden of proof implied by the other erroneous instructions.

Thus, it is impossible to conclude with any certainty, from either the evidence or the verdict itself, that the court's erroneous jury instructions were harmless as to the first arrest. For that reason, we find that the jury charge was reversible error, requiring a new trial as to Tatro's claims surrounding his first arrest.

### D. *Other Jury Instructions*

#### 1. Tatro's First Amendment claim.

Tatro alleged at trial that Officer Kervin arrested him the first time at least in part because of Tatro's statement, "I can't believe what is happening," in violation of Tatro's First Amendment right to freedom of speech. The court instructed the jury that to establish this claim, Tatro had to prove that he "would not have been arrested, *but for* the police officer's intent to interfere with Tatro's freedom of speech." (emphasis added). Ta-

tro argues that this instruction was erroneous because all that Tatro needs to prove is that Tatro's speech entered into the officer's decision to make the arrest, at which point the burden shifts to the police officer to prove that he would have arrested Tatro even in the absence of Tatro's speech.[4]

The plaintiff's standard of proof in a § 1983 action alleging First Amendment violations by a police officer has never been explicitly addressed by this circuit. Other circuits considering the matter, however, have adopted standards from the employment discrimination context. *See, e.g., Sloman v. Tadlock*, 21 F.3d 1462, 1471 (9th Cir.1994); *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir.1992). This Circuit has consistently applied a "but for" standard in mixed motive employment discrimination cases, *see, e.g., Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979), and we see no reason why this standard should not also apply here.

Accordingly, the district court's "but for" instructions to the jury were not erroneous. We note, however, that a "but for" instruction could be misunderstood to imply that a plaintiff must show *sole* causation or motive. This would be incorrect. As in the employment discrimination context, the plaintiff need not prove that the defendant's *sole* motive was to chill the plaintiff's protected expression. The plaintiff need only show that the officer's intent or desire to curb the expression was the *determining* or *motivating* factor in making the arrest, in the sense that the officer would not have made the arrest "but for" that determining factor. Trial courts should clarify their "but for" standard to this effect when charging a jury.[5]

---

4. Tatro cites *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) as support for applying this burden-shifting analysis, but acknowledges that it is "questionable" whether the *Mt. Healthy* test, developed for mixed motive discrimination or retaliatory termination cases, applies in the context of this action. Because it is unnecessary in light of our analysis, *infra*, we decline to decide here whether the *Mt. Healthy* burden-shifting test applies.

5. Because we have already determined that the district court committed reversible error as to the other charges, it is unnecessary to analyze whether the jury in this case did indeed misunderstand the court's "but for" instructions. On remand, however, the court should clarify its instructions in accordance with our explanation.

## 2. Tatro's state civil rights claim.

Tatro also alleges that the court misled the jury by instructing them that, "as a general matter [ ] verbal abuse, specifically, being cursed at by a police officer, does not constitute a violation of anyone's civil rights." According to Tatro, this instruction was error because his case contains a claim under the Massachusetts Civil Rights Act, Mass. Gen.L. ch. 12, §§ 11H and I, which provides for a cause of action if the plaintiff's exercise of constitutional rights is interfered with by "threats, intimidation or coercion."

In its charge to the jury regarding the state civil rights claim, however, the court carefully delineated the statute's requirements:

> [T]he denial of ... Mr. Tatro's civil rights by, it is alleged, Mr. Kervin, has to be accomplished by threats, coercion, or intimidation. A threat simply means saying or gesturing, in effect, if you don't do this, then something will happen to you. Coercion is making someone do something they are unwilling to do. Intimidation is scaring them into doing something or refraining from doing something that otherwise they would do. If you find threats, coercion, or intimidation, ... then he has proved a violation of the Massachusetts civil rights statute.

Taken together, all these instructions on the civil rights statute are a thorough and appropriate explanation to the jury of the plaintiff's burden. We do not believe that the jury could have been misled into thinking that being cursed at by a police officer could *never* constitute threat or intimidation. The charges read as a whole merely state, accurately, that a curse does not violate any civil rights *unless* it rises to the level of a threat or an attempt to intimidate. Thus, the court's statement was proper.

## III. CONCLUSION

For the foregoing reasons, the verdict is therefore *affirmed as to the plaintiff's second arrest, and reversed and remanded for new trial only as to the plaintiff's first arrest.*