# United States Court of Appeals
## For the First Circuit

No. 99-2143

JOSE ALICEA PONCE, ET AL.,

Plaintiffs, Appellants,

v.

ASHFORD PRESBYTERIAN COMMUNITY HOSPITAL,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, <u>U.S. District Judge</u>]

Before

Lynch and Lipez, <u>Circuit Judges</u>,

and García-Gregory,[*] <u>District Judge</u>.

José Luis Ubarri-García, with whom Herbert W. Brown III and Brown & Ubarri were on brief, for appellants.
José A. Iguina de la Rosa, with whom Martinez-Texidor & Fuster were on brief, for appellee.

---

[*] Of the District of Puerto Rico, sitting by designation.

January 17, 2001

**LYNCH, Circuit Judge.** On September 4, 1993, plaintiff Wanda Sánchez gave birth to her daughter Natalie at defendant Ashford Presbyterian Community Hospital. The delivery was difficult; after the attending physician applied considerable traction, Natalie emerged, but with an injury resulting in partial paralysis of her left arm. This medical malpractice suit followed, brought under diversity jurisdiction by Ms. Sánchez, Natalie, and Ms. Sánchez's husband, José Alicea Ponce. The suit was originally brought against the physicians who had cared for Ms. Sánchez during her pregnancy, including the one who delivered Natalie. Subsequently, Ashford was joined as a defendant. Plaintiffs settled with the physicians for $400,000, but continued their case against Ashford. After trial by jury, Ashford was found to be fifty-percent liable for plaintiffs' damages, which were assessed at, again, $400,000 (although the jury had not been informed of the settlement). The trial judge threw out the verdict for want of sufficient evidence. This appeal ensued. We hold that, even if the verdict against Ashford were supported by sufficient evidence, it constitutes an impermissible double-recovery given plaintiff's prior settlement with the physicians. We therefore affirm without having to reach the issue of sufficiency of the evidence or related issues plaintiffs raise.

We summarize the facts in the light most favorable to the plaintiff.  Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1186 (1st Cir. 1996).

Ms. Sánchez became pregnant in 1993.  Having delivered a previous child by Caesarian section, she sought pre-natal care at Centro Gineco-Obstétrico; the center specialized in natural childbirth after a Caesarian section.  Her treating physicians there included Dr. Héctor Rosario, Dr. María Román, Dr. Carlos Roure, and Dr. José Santiago.

On September 3, 1993, a week before her due date, Ms. Sánchez was examined by Dr. Roure, who determined that Ms. Sánchez's pregnancy was causing her to suffer hypertension and that she should be hospitalized.  Since Ms. Sánchez was so close to her due date, her doctors decided to induce labor the next day.

Labor was induced the morning of September 4, 1993.  Dr. Rosario was the attending physician; also present at various times were several nurses, including Nurse Elsie Oliveras.  After several hours of contractions, the baby's head emerged, but then retracted -- an indication (called the

"turtle sign") that the baby's shoulder was stuck.[2]  In response, Dr. Rosario instructed Nurse Oliveras to push Ms. Sánchez's legs toward her head (putting her in the "McRoberts position") and then to apply suprapubic pressure, so as to rotate and free the baby's shoulder.

Nurse Oliveras seemed confused over how to execute these maneuvers.  After she attempted to put Ms. Sánchez in the McRoberts position, Dr. Rosario told her in an urgent tone that she was performing the maneuver incorrectly and directed her to do it the right way.  Then, after being told to apply suprapubic pressure, Nurse Oliveras repeatedly asked "How, how do I do this?"

At this point, Dr. Rosario sought outside help.  He left the room for a minute or so and returned with another doctor.  The other doctor applied suprapubic pressure, and soon after baby Natalie was delivered.  It later became apparent that as a result of the traumatic delivery, Natalie had suffered an injury to her "brachial plexus" -- a net of nerves connecting the spinal cord with the arm; due to the injury, she is unable to lift her left arm past 30 degrees. The specific cause of the injury, crediting plaintiffs' evidence, was probably excessive traction by Dr. Rosario

_____

[2]  This condition is termed "shoulder dystocia."

during delivery, i.e., excessive pulling that overly strained the nerves near the baby's neck.

On May 18, 1995, plaintiffs brought suit against Drs. Rosario, Román, Roure, and Santiago of the Centro Gineco-Obstétrico. The crux of the claim was that the doctors were negligent in providing care to Ms. Sánchez by failing to advise her that, due to her having diabetes, she bore a high risk of a complicated natural childbirth, and that a Caesarian section was the safer alternative.

Subsequently, plaintiffs amended their complaint to include Ashford as a defendant. Plaintiffs claimed that Ashford was negligent in failing to provide qualified nursing staff during the delivery, as evidenced by Nurse Oliveras's confusion over how to perform the maneuvers ordered by Dr. Rosario. As developed at trial, plaintiffs' theory was that because of Nurse Oliveras's confusion, Dr. Rosario was forced to seek outside help, using up precious time. (After a doctor sees the turtle sign, he or she has less than ten minutes to deliver the baby; any longer risks brain damage or death by suffocation.) Due to the resulting time pressure, plaintiffs claimed, Dr. Rosario hurried the remainder of the delivery and, in his rush, applied the excessive traction that caused Natalie's injury.

-6-

On September 28, 1998, plaintiffs settled with the physician defendants for $400,000. The physicians remained parties in the case, however, as the subjects of a cross-claim by Ashford. After trial, by way of a special verdict form, the jury found both Ashford and the physicians negligent, attributing half the liability for Natalie's injury to Ashford and half to the physicians. The jury assessed plaintiffs' total damages to be $400,000; Ashford's resulting liability was $200,000.

Subsequently Ashford moved to set aside the verdict for insufficient evidence. The trial judge granted the motion, finding there was no evidence that Ashford's nurses were undertrained, nor evidence that the nurses in any way contributed to Natalie's injury. See Ponce v. Ashford Presbyterian Community Hosp., 189 F.R.D. 31 (D. P.R. 1999). Plaintiffs now appeal.

## II.

Plaintiffs' appeal is essentially three-pronged. They argue: first, that there was sufficient evidence to support the jury's finding that Ashford was negligent; second, that there was not sufficient evidence to support the jury's finding that the physicians were negligent; and third, that the trial judge committed various errors that led the jury to

underestimate plaintiffs' damages.[3]  They ask this court to reverse the trial court's decision to vacate the verdict against Ashford, to enter judgment as a matter of law on Ashford's cross-claim against the physicians, and to remand for a partial new trial limited to the question of damages.

The third prong of plaintiffs' appeal is crucial to their case.  Even if plaintiffs were correct that there was sufficient evidence to find Ashford negligent but insufficient evidence to find the physicians negligent -- leaving Ashford 100% liable for plaintiffs' damages -- plaintiffs' victory would be a hollow one.  The resulting award against Ashford would be $400,000; yet plaintiffs have already recovered precisely this amount in settlement from the physicians. Since Puerto Rico (like most jurisdictions) prohibits double recovery in this context, plaintiffs would net exactly zero. Villarini-Garcia v. Hospital Del Maestro, 112 F.3d 5, 7 (1st Cir. 1997).  Thus, in order to prevail, plaintiffs must show that the jury was erroneously led to underestimate damages, so as to reopen the possibility of winning an award on remand exceeding their settlement.[1]

_____

[3]  Other arguments raised by plaintiffs we ignore because they were premised on the case being remanded.

[1]  Ashford timely raised the double recovery issue at trial, although the district court did not address it in its written

-8-

We see no prejudicial error underlying the jury's damages assessment, however. Plaintiffs allege three such errors, which we address seriatim. First, they take issue with the following jury instruction:

> Ashford may not be found liable for any damages which may have been caused by the negligent acts or omissions of the treating physicians. Plaintiffs may only recover damages against Ashford if they establish . . . that the injury suffered by baby Natalie Alicea Sánchez was proximately caused by Ashford's negligent acts or omissions.

Plaintiffs argue that the instruction misled the jury to believe that it was supposed to assess only that portion of plaintiffs' damages attributable to Ashford, rather than plaintiffs' total damages; had the jury properly understood the latter as its task, it would have reached a figure of $800,000, rather than fifty percent of that.

However, plaintiffs did not object to the instruction on this ground at trial; to the contrary, plaintiffs suggested the very language used in the instruction and agreed that the instruction "should be clear that Ashford is liable for its own negligence exclusively." Having waived the claim, Ashford is entitled to review only for plain error,

---

opinion. Ashford also properly preserved the double recovery issue on appeal.

Drohan v. Vaughn, 176 F.3d 17, 21 (1st Cir. 1999), and we find none.

The gist of the instruction was simply that Ashford could not be held vicariously liable for the acts of the defendant physicians. Unlike in the case plaintiffs rely on, Murray v. Ross-Dove Co., 72 F.3d 1 (1st Cir. 1995), the instruction here did not specifically state -- or even suggest -- that in measuring damages (as opposed to determining liability) the jury was to consider only damages attributable to Ashford. Cf. id. at 2. Moreover, the special verdict form -- which most immediately guided the jury's deliberations -- gave no indication that the jury was to apportion damages on its own. The form did ask the jury to apportion liability as between the defendants; but as to damages, the form simply asked the jury to determine "what amount of damages" plaintiffs had suffered, without limiting the question to those damages attributable to Ashford.[2] We thus see no error -- plain or otherwise -- in the guidance given the jury on this point.

---

[2] Plaintiffs did object to the special verdict form, but only to the portion addressing liability, not the portion addressing damages. Specifically, plaintiffs objected that there was insufficient evidence to find the physicians negligent, so the verdict form should not ask the jury to apportion liability among the doctors and the hospital.

Plaintiffs next allege error in a separate instruction directing that the jury "should consider the economic realities of Puerto Rico" in calculating Natalie's lost earning capacity. At trial, the question of what the basis for that calculation should be was controverted. Plaintiffs' damages expert based his calculation on national statistics that did not include data from Puerto Rico, on the ground that since Natalie was a child, one could not predict where she would reside in her working adult life. Ashford argued that this ground was purely speculative and that an accurate assessment of Natalie's lost earning capacity had to reflect the dramatic differences in economic prospects between stateside residents and residents of Puerto Rico. The judge agreed with Ashford, but declined to strike the expert's testimony, as requested by Ashford; instead, as a curative instruction, the judge told the jury to consider, in its assessment of lost earning capacity, Puerto Rico's particular economic circumstances -- its unemployment rate, the participation of women in its work force, and so on.

Plaintiffs did object to this instruction at trial, so we review de novo to determine if the instruction misled the jury with respect to applicable law. Tatro v. Kervin, 41 F.3d 9, 14 (1st Cir. 1994). The instruction was not

-11-

misleading.  While Puerto Rico has not ruled specifically on whether a minor's lost earning potential is to be assessed according to local economic statistics, it has ruled generally that such assessment is to rest on the most concrete, individualized data available; unbounded speculation is frowned upon.  Ruiz Santiago v. Puerto Rico, 116 P.R. Offic. Trans. 376, 393-94 (P.R. 1985).  The judge's instruction aligned with this dictate; the instruction properly directed the jury to look to the economic data most specifically applicable to the case.[3]  Importantly, this directive was a soft one: the judge did not instruct the jury that it had to rely exclusively on Puerto Rico data, or that it was forbidden from relying in any way on the national data provided by plaintiffs' expert; he merely instructed the jury that it "should consider" local economic conditions.  So benign an instruction leaves plaintiffs little ground for complaint.

Finally, plaintiffs allege prejudicial error in the accidental submission of two exhibits to the jury.  The exhibits consisted of an extrajudicial claim letter sent by

_____

[3]  There was no specific evidence to suggest that Natalie would spend her working life somewhere else than Puerto Rico. Natalie and her family did move to Massachusetts for a period around 1995; but the stay was for the purpose of obtaining better medical treatment for Natalie.  After Natalie's treatment concluded, the family returned to Puerto Rico where they currently reside.

Ms. Sánchez to Dr. Rosario a year after Natalie's delivery and a reply letter sent by Dr. Rosario's counsel.  The letters were marked as exhibits for the purpose of adjudicating a statute of limitations issue.  However, the judge specifically directed the court clerk not to submit the letters to the jury, in accordance with the court's prior ruling under Federal Rule of Evidence 408 that the jury should not be made aware that plaintiffs had already settled a claim against the physicians.  Notwithstanding, the court clerk by her own admission accidentally sent the letters to the deliberation room along with all other trial exhibits.

Obviously, sending the two letters to the jury room was a mistake; but we do not think it rose to the level of a prejudicial error.  Ms. Sánchez's claim letter indicated merely that plaintiffs' first move in this dispute was to seek compensation from Dr. Rosario, whom, the letter said, was entirely responsible for the injury; in response, the letter from Dr. Rosario's counsel vehemently denied liability, urged Ms. Sánchez to drop her claim, and threatened countersuit if she did not.  Taken together, the letters gave no indication that the two parties ever arrived at a settlement; indeed, it is not even clear from the letters whether plaintiffs proceeded any further with their claim against Dr. Rosario.

Thus, while keeping the letters from the jury certainly would have accorded with the trial court's general ruling not to allow in evidence of a prior settlement, by themselves the letters were uninformative on this point. For the letters to have resulted in prejudice (assuming that the jury actually viewed them), they would have to have led the jury to hypothesize that a settlement had occurred, to speculate as to its amount, and to subtract that amount from plaintiffs' damages despite not having been instructed to do so. There is no reason to believe that the jury digressed down this path -- especially given the considerable sum at which the jury assessed plaintiffs' damages. Cf. Phav v. Trueblood, 915 F.2d 764, 768 (1st Cir. 1990) (considering parsimonious jury award as one indicator of tainted deliberations).

For these reasons, we find no error in the jury's computation of damages. Left as it stands, the jury's award is redundant with plaintiffs' prior settlement and hence constitutes an impermissible double-recovery. Accordingly, we affirm the district court's decision to dismiss the case.

So ordered. Each side to bear its own costs.