Roger RINGUETTE, Plaintiff, Appellant,

v.

CITY OF FALL RIVER, et al.,
Defendants, Appellees.

No. 96–1107.

United States Court of Appeals,
First Circuit.

Heard April 8, 1998.

Decided June 4, 1998.

2

Brian R. Cunha with whom Brian Cunha & Associates was on brief for appellant.

Mary O'Neil, First Assistant Corporation Counsel, Law Department, for appellees City of Fall River and Richard Levesque.

Andrew B. Peppard and Borders, Littman & Peppard on brief for appellee Richard Levesque.

William G. Camara with whom William G. Camara, P.C. was on brief for appellee Raymond Paradis.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

BOUDIN, Circuit Judge.

Roger Ringuette brought this action in the district court against the City of Fall River and several police officers for medical injuries that he suffered, through inattention by the police, while he was in police custody. He recovered a judgment against the city for negligence, but the district court dismissed on qualified immunity grounds a "Fourth Amendment" claim against two police officers.

Save in one significant respect, the background facts pertinent to the appeal are undisputed. On July 27, 1992, at about 7 p.m., police in Fall River, Massachusetts, respond-ed to a report of a disabled person and found Ringuette slumped over a car in a stupor. According to the officers, Ringuette was unsteady on his feet, had bloodshot eyes, and smelled of alcohol. Believing him to be drunk, the police asked if he wanted a ride home. He replied, "to my brother's" but gave no address. Asked if he wanted to go to "detox," he gave the same answer.

Later evidence indicates that Ringuette was suffering from an overdose of prescription pills, although the police did not know this at any relevant time. Not knowing how to contact Ringuette's brother, the police took Ringuette into protective custody pursuant to the Massachusetts Alcoholism Treatment and Rehabilitation Act, Mass. Gen. Laws ch. 111B, § 8. The police handcuffed him, put him in the police car and drove him to the station.

Under section 8 of the Act, a person incapacitated by alcohol is to be taken with or without his consent to his own residence, to a treatment facility, or to a police station. If taken to a police station, the officer in charge is to transfer him to the nearest treatment facility, if available. The statute continues:

> No person assisted to a police station pursuant to this section shall be held in protective custody against his will; provided, however, that if suitable treatment at a [treatment] facility is not available, an incapacitated person may be held in protective custody at a police station until he is no longer incapacitated or for a period not longer than twelve hours, whichever is shorter.

In fact, Ringuette remained at the facility for more than twelve hours—whether he was "held" after twelve hours is a different question—and during this period he suffered serious injury. Ringuette was booked into the police station at 7:19 p.m. and assisted to a cell which was neither monitored by video camera nor directly observable by the booking officer.[1] No call was made to the local treatment center; but according to later evidence, no bed was then available, and the

---

1. The "booking officer" on the shift is the officer immediately responsible for booking persons, cell checks and the feeding of prisoners. He reports to a shift sergeant who supervises several units.

center had not admitted anyone from the police station on short notice in the previous seven years.

During the night of July 27–28, Ringuette was monitored by an officer at 15–minute intervals, as required by department regulations. According to the officer, at around 5 a.m., the officer found Ringuette standing in his cell and asked if he was ready to be released; in reply, Ringuette swore at him. The officer further testified that at the officer's last check, at 6:20 a.m., Ringuette said he was not ready to leave and was told that he would nevertheless be released when the officer of the next shift came on in about 15 minutes.

Officer Paradis, one of the three individuals named as a defendant in this case, took over as booking officer at 6:50 a.m. on July 28 and was told of the prior conversation with Ringuette. Paradis knew Ringuette from prior periods of protective custody. According to Paradis, shortly after he came on duty, he asked Ringuette if he wanted to leave, and Ringuette replied in "slurred" speech: "I've got nowhere to go and I'm still half in the bag." Told of these events, Sergeant Levesque, who was then the supervising sergeant, authorized Paradis to fill out a second protective custody form, although the statute makes no reference to a second form and provides for protective custody "for a period of not longer than twelve hours."

It appears that Paradis then checked on Ringuette only a couple of times in the succeeding eight hours between 7 a.m. and 3 p.m., when Paradis was relieved by another officer. Throughout his time at the police station, Ringuette was given neither food nor water, despite the department handbook's policy requiring the feeding of persons kept in protective custody for more than five hours. At around 3 p.m., a new officer took over and found Ringuette sitting and then lying on the floor. At this point, Ringuette refused food and mumbled incoherently.

Finally, at around 6 p.m. on the evening of July 28, after Ringuette had been in the cell for almost 24 hours, the police officer on duty realized that Ringuette was moaning and making gurgling noises. Levesque called a medical technician who arrived almost immediately and found that Ringuette was in a state of shock, lying motionless in a pool of vomit, with eyes dilated and his pulse racing. At the hospital, doctors found him to be in severe shock—that is, having no measurable blood pressure—severely dehydrated with several vital bodily functions impaired, and suffering from a drug overdose of prescription pills and from first and second degree burns (which are unexplained).

Ringuette now suffers from seriously impaired use of his left arm and left leg, caused by "compartmental syndrome." This is a muscle-tissue condition associated with tissue compression, in this case due to lying in the same position for a long period and compounded by the drug overdose. Expert testimony at trial indicated that the condition likely occurred within three to six hours prior to the technician's arrival. In the aftermath, Police Chief McDonald filed charges against Paradis and Levesque and after a hearing, both were found liable of derelictions.

On June 2, 1993, Ringuette filed a 17–count complaint in the district court, asserting various state law claims and federal claims under 42 U.S.C. § 1983. The defendants named in the complaint were the city, Chief McDonald, officer Paradis and Sergeant Levesque. On summary judgment, defendants obtained a dismissal of a number of claims, *Ringuette v. City of Fall River*, 888 F.Supp. 258 (D.Mass.1995), but several claims were reserved for trial, and the issue of qualified immunity was not resolved. This summary judgment decision is not directly challenged on this appeal, and we confine ourselves solely to the remaining claims that were not then dismissed on summary judgment.

After the summary judgment decision, the claim against the city for negligence was left standing (state law barred such a claim against the police officers). McDonald had been dismissed from the case on summary judgment, but two constitutional claims remained against Paradis and Levesque: a so-called "Fourth Amendment" claim based on unlawful seizure, and a claim under the Fourteenth Amendment's due process clause

for deliberate indifference to Ringuette's medical needs while in police custody.[2] As to these claims, the district court said that it could not resolve qualified immunity issues without factfinding and sent the claims to trial. 888 F.Supp. at 266, 270.

The case was tried over a number of days in October and November, 1995. After the evidence was presented but before submitting the case to the jury, the court withdrew the Fourth Amendment claim on qualified immunity grounds, granting the officers' motions for judgment as a matter of law; the court's reasoning is set forth in a published memorandum. 906 F.Supp. 55 (D.Mass. 1995). The court then submitted to the jury, together with a special verdict form, the Fourteenth Amendment claims against the officers and the negligence claim against the city.

By special verdict, the jury denied recovery against the officers, finding that Ringuette had failed to prove that either officer acted with "such recklessness as to constitute deliberate indifference to Ringuette's serious medical needs." As to the city, the jury found that it was liable for negligence and eventually set damages at $1,780,360. Based on a statutory cap, the court later reduced damages to $100,000. Mass. Gen. Laws ch. 258, § 2. Ringuette now appeals, urging that the district court erred in dismissing the Fourth Amendment claim against the officers on grounds of qualified immunity.

█ The central issue on appeal is whether the district judge properly sustained the defense of qualified immunity on the Fourth Amendment claim, but we first face a threshold issue: Ringuette says that while Levesque pleaded the defense in his answer to the complaint, Paradis failed to do so and therefore waived it. Qualified immunity is an affirmative defense, Fed.R.Civ.P. 8(c), and an affirmative offense is generally lost unless it is raised in the pleadings. 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (2d ed.1990).

█ However, Ringuette waived his own procedural objection by failing to assert it in the district court when the officers moved for judgment as a matter of law on grounds of qualified immunity. Apparently, no one realized that Paradis had failed to assert this defense. When Levesque's counsel renewed a general motion for judgment as a matter of law after the close of evidence, a motion previously joined in by all defendants, the district judge held both officers protected by qualified immunity without distinguishing between them. 906 F.Supp. at 58. After the jury verdict, Ringuette's counsel moved for reconsideration on the qualified immunity issue but argued it again on the merits without suggesting that Paradis had waived the defense.

Paradis' failure to assert the defense in his answer to the complaint did not prejudice Ringuette, because Ringuette's position on qualified immunity is the same as to both officers, and he presented it to the district court both before the summary judgment decision and after the ruling at trial. Had the waiver objection been raised in the district court, Paradis would have had a good chance of persuading the district judge to allow the defense by an amendment to the answer. The issue, in short, was presented to the court without objection and decided on the merits. Accordingly, Ringuette's procedural objection fails. *Manchester Gardens, Inc. v. Great West Life Assur. Co.*, 205 F.2d 872, 877 (D.C.Cir.1953); Fed.R.Civ.P. 15(b).

The merits of the qualified immunity defense, ably analyzed by the district judge in her published opinion, are more troublesome. At issue are Ringuette's claims that he was "seized" by being detained by the police in protective custody, and that this seizure became "unreasonable" under the Fourth Amendment when a twelve-hour time limit under state law expired. On this double premise, he sought damages for the medical injuries he suffered on the ground that they flowed from a state actor's violation of his

---

**2.** Technically, both constitutional claims rest on the Fourteenth Amendment, since the Fourth Amendment is directed to federal action and its constraints govern state officers only by "incorporation" of Fourth Amendment standards into the Fourteenth Amendment. However, the labels used by the district court are a convenient way to distinguish between the seizure claim and the deliberate indifference claim.

federal constitutional right under color of state law. 42 U.S.C. § 1983.

■ Under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the police in their arrest and detention functions are normally "shielded from liability for civil damages" under federal law insofar as their conduct does not violate "clearly established" rights of which "a reasonable person would have known." It is not enough for the constitutional right to be "clearly established" at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law. *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir.1998) . This qualified immunity standard leaves "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ The district court said that while the issue was "far from clear cut," "Ringuette's re-PC [*i.e.*, the renewal of the protective custody order after the first twelve hours] was a Fourth Amendment seizure conducted without lawful authority, and therefore, was unreasonable." 906 F.Supp. at 57.[3] And while not every violation of a state statute bearing on detention would necessarily constitute an "unreasonable" seizure under the Fourth Amendment, we agree with the district court that the statute's twelve-hour limitation on protective custody was intended as a fundamental limitation on state authority to detain Ringuette.

If Ringuette had gotten up after twelve hours and demanded to be released, it is likely that a refusal to let him out would have constituted not only a violation of the Fourth Amendment but one that a reasonable Massachusetts police officer should have known to be such a violation. Even without any direct precedent, the explicit limitation in the state statute arguably made further involuntary detention a constitutional violation clear enough—on most facts—so as to negate any police claim of a reasonable mistake. *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 1227–28, 137 L.Ed.2d 432 (1997).

The difficulty for Ringuette is that this leaves out half of the story. Ringuette was not a citizen demanding to be released from confinement. He was, from all appearances, still drunk or otherwise incapacitated, and—according to the district court findings—he rebuffed two offers to release him, one made shortly before the end of the twelve-hour period and one made not long thereafter. Nor did he later ask to leave. The notion that police officers should simply have put Ringuette out on the street against his will in his then-apparent condition is implausible.

■ Thus, while Ringuette's further "confinement" can be called an unreasonable seizure once the twelve-hour period had passed, the unreasonableness was obviously mitigated by the offers to release him, the belief that he remained incapacitated, and the implicit willingness to let him go whenever he said he was ready. The police decision was neither at odds with "clearly established" case law under the Fourth Amendment, nor so manifestly unreasonable a "seizure" that any reasonable police officer should have regarded it as such. That is enough for qualified immunity. *Joyce v. Town of Tewksbury, Mass.*, 112 F.3d 19, 22–23 (1st Cir.1997).

■ Having jailed Ringuette and left him in the cell, the police not only assumed a duty of reasonable care—which the city was found to have breached—but also in their later supervision arguably exhibited a deliberate indifference to Ringuette's medical needs so as to subject them to potential liability under the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir.1990). The latter was at best a debatable claim since the deliberate indifference standard is more than negligence. *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir.1992). In any case, the jury squarely rejected it in its verdict in favor of the police officers.

---

**3.** The district court pointed out that Ringuette was not only formally detained under a new protective custody form but also left in a locked jail cell. The district court treated the mitigating circumstances as pertinent not to the existence of a seizure but to its reasonableness.

Because the offers to Ringuette to release him and his refusals are of importance, we note that these "facts" were not entirely undisputed. Ringuette's brief refers to, but does not develop, testimony by his medical expert at trial suggesting that Ringuette was clearly incapacitated and perhaps incapable of speech for the last several hours of his confinement and may have been so incapacitated at an earlier period. Depending on how the doctor's somewhat ambiguous testimony is read, it might be argued that this testimony is in conflict with that of the two officers who said that Ringuette was offered the opportunity to leave but twice apparently declined.

If so, the district court, in dismissing the Fourth Amendment claim on qualified immunity grounds, resolved the dispute in favor of the officers, concluding that the testimony "demonstrated that . . . when attempts were made to release Ringuette, he expressed a desire to remain there, or responded in a way which the police officers believed indicated consent." 906 F.Supp. at 58. This finding is supported by testimony of two different police officers, one of them not a defendant in the case, and it is not directly challenged on appeal.

Something of a "black hole" exists in the law as to how to resolve factual disputes pertaining to qualified immunity when they cannot be resolved on summary judgment prior to trial. To avoid duplication, judges have sometimes deferred a decision until the trial testimony was in or even submitted the factual issues to the jury. *See St. Hilaire v. City of Laconia,* 71 F.3d 20, 24 n. 1 (1st Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2548, 135 L.Ed.2d 1068 (1996). In all events, the district judge's procedure here, which is not challenged on appeal, seems to us to have been eminently sensible.

*Affirmed.*