Pauline **HOWES** and Alexander Howes, Plaintiffs,

v.

Brian **HITCHCOCK**, Donald Decker, Keith McLellan, and the Town of Marblehead, Massachusetts, Defendants.

No. Civ.A. 98–10546–PBS.

United States District Court, D. Massachusetts.

Sept. 9, 1999.

Daniel S. Sharp, Whitfield Sharp & Sharp, Marblehead, MA, Daniel S. Sharp, Marblehead, MA, for Pauline Howes, plaintiffs.

Leonard H. Kesten, Brody, Hardoon, Perkins & Kesten, Boston, MA, Kurt B. Fliegauf, Brody, Hardoon, Perkins & Kesten, Boston, MA, for Brian Hitchcock, individually and as an Officer of the Marblehead Police Department, defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case arises out of the warrantless police entry of a private residence to end an underage, unsupervised drinking party. In March 1998, plaintiffs Pauline Howes and her son Alexander Howes brought suit against three police officers and their employer, the Town of Marblehead, Massachusetts, under 42 U.S.C. § 1983 for violation of their Fourth Amendment rights to

be free from unreasonable entries into their home. At the close of the trial against the individual defendants, the jury returned a verdict for the police officers.

Plaintiffs now press a motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(b) or, in the alternative, move for a new trial. Although the Framers of the Constitution did not carve teenage drinking parties out of the Fourth Amendment's protection against warrantless home entries, the potential threat to life and safety posed by a large underage drinking party with no parent home, and concerns for destruction of evidence, were exigent circumstances permitting the warrantless entry here. After hearing, plaintiffs' motion for judgment as a matter of law, or for a new trial, is **DENIED.**

## BACKGROUND

The following account states the facts in the light most favorable to the verdict. *See O'Connor v. Huard,* 117 F.3d 12, 14–15 (1st Cir.1997) (citing *Ferragamo v. Chubb Life Ins. Co.,* 94 F.3d 26, 27 n. 1 (1st Cir.1996)), *cert. denied,* 522 U.S. 1047, 118 S.Ct. 691, 139 L.Ed.2d 636 (1998).

At approximately 8 p.m. on July 3, 1996, defendant Sargent Brian Hitchcock began surveillance of the Howes residence in Marblehead, where plaintiff Pauline Howes lived with her two sons, Alex and William. At the time, both boys were under the age of twenty-one. Sargent Hitchcock suspected that an underage drinking party might be taking place at the house that night. Under Massachusetts law, it is a misdemeanor for a person "under twenty-one years of age and not accompanied by a parent or legal guardian ... knowingly [to] possess[ ], transport[ ] or carr[y] on his person ... any alcohol or alcoholic beverages." Mass.Gen.L. ch. 138, § 34C (West Supp.1999).

Sargent Hitchcock based his suspicion in part on the numerous complaints that the Marblehead Police Department had received over the past several years—including at least one received just a few days

earlier—from neighbors concerned about noise, traffic, and possible illegal activity associated with the home. According to the neighbors, Pauline Howes frequently left her sons alone, and the boys, unsupervised, threw wild parties. In addition, Bill Howes, the boys' father and Pauline's ex-husband, had expressed to Sargent Hitchcock his belief that drinking and drug abuse were occurring on a regular basis at the home. Sargent Hitchcock also knew that police in Swampscott, Massachusetts, had arrested Alex in 1995 in connection with the purchase of marijuana. Finally, Sargent Hitchcock had had a conversation with Pauline Howes prior to July 3, 1996, about Alex's alleged drug problems, and he had told her that he was concerned, based on her physical appearance at the time, that she herself was using narcotics.

From the time Sargent Hitchcock arrived at the residence at 8 p.m., he observed large numbers of teenagers pulling up in cars and entering or exiting the house carrying bottles and cans of beer. He also saw cases of beer being transported to the garage. He continued to observe the house for the next two-and-a-half hours. Although he left the scene at least once during this time, he did not attempt to obtain a search warrant. By 9 p.m., Sargent Hitchcock had probable cause to conclude there was underage drinking in the house.

At about 10:30 p.m., Sargent Hitchcock convened briefly in a nearby parking lot with three other Marblehead police officers whom he had summoned to the residence: Officer Gregory Lapham, defendant Officer Donald Decker, and defendant Officer Keith McLellan. Sargent Hitchcock told the officers simply that an underage drinking party was in progress at the house. Sargent Hitchcock also indicated that he expected to make some arrests that evening. The officers then drove back to the Howes residence and parked their cars out of the partygoers' view.

Once there, Officer Lapham and Sargent Hitchcock went to the back of the house. Sargent Hitchcock stationed himself on the rear deck, inside the fenced-in backyard. Officers Decker and McLellan went to the front of the residence. Officer Decker knocked on the front door to determine the extent of the underage drinking that Hitchcock had observed and to ascertain whether an adult was present. Darryl Knight, a minor, answered the door. Through the open doorway, Officer Decker saw a number of teenagers drinking alcohol and milling about inside the living room. He asked to speak with the owner of the house. Knight shut the door and went to get Alex and William Howes. A few moments later, the two boys appeared at the door. Officer Decker told them that he thought people were drinking inside, and asked them if their parents were at home. They replied that their parents were not there and admitted that no one inside the house was twenty-one. Officer Decker then said that he wanted to go inside. The boys refused him entry. Officer Decker entered the house anyway.[1]

Meanwhile, at the back of the house, Officer Lapham heard the bedroom window open and saw some teenagers attempting to climb out. He told them to stay inside. From his vantage point on the deck, Sargent Hitchcock could see into the home through the kitchen window. He observed a number of people running through the house and downstairs. Sargent Hitchcock eventually entered the home through a back door.

Once inside the house, the officers arrested nineteen teenagers. After the arrests, at the station, the officers applied for, and within thirty minutes obtained,[2] a search warrant for the home. Partly on the basis of the items seized pursuant to the warrant, Pauline Howes was charged with drug-related offenses and with contributing to the delinquency of a minor. Alex was also charged with a drug offense and with illegal possession of alcohol in violation of Mass.Gen.L. ch. 138, § 34C. The criminal charges against both Pauline and Alex were dismissed after the state court suppressed the evidence obtained on the ground that the officers had initially entered the Howes residence without consent or exigent circumstances.

Pauline and Alex Howes filed this civil rights action on March 27, 1998. In addition to their Fourth Amendment claims, the amended complaint also contained a § 1983 claim by Pauline Howes for malicious prosecution, which plaintiffs voluntarily dismissed before trial, and a claim under the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, § 11I. The Court severed the § 1983 claim against the Town of Marblehead pending resolution of the case against the individual defendants. The Court also bifurcated liability and damages because plaintiffs' counsel, who also served as their attorney at the criminal proceedings, would have to be a witness with regard to damages. Plaintiffs moved for summary judgment, which the Court denied. The Court also denied defendants' motion for summary judgment, which was predicated solely on the issue of the availability of compensatory damages.

At trial, the parties did not dispute that, at the time of entry, the officers had probable cause to believe that illegal underage

---

1. Both Officer Decker and Alex Howes testified that Officer McLellan was with Decker at the front door and entered the house with him. Officer McLellan, however, testified that he stood watch at the garage while Officer Decker approached the front door and that he did not enter the home until after the partygoers had been arrested. Officer McLellan stated that he heard the sound of tin cans scraping inside the garage while he stood outside.

2. Depending on the location of the clerk-magistrate on duty during the nighttime, Marblehead police seeking a warrant can expect a callback on a pager within two hours, and usually within thirty minutes. The whole process of receiving a warrant typically takes one to two hours.

drinking was occurring inside the Howes residence.[3] Rather, they focused the jury's attention on the issue of exigent circumstances, which in this case involved an assessment of when the officers reasonably could have believed that probable cause had arisen. The officers argued that two types of exigent circumstances existed to justify their warrantless entry: the threat of destruction of evidence and the danger to the public and the teenagers inside the house posed by the unsupervised consumption of alcohol by minors. After the Court reserved ruling on the parties' motions for directed verdict at the close of the evidence, the jury found for the officers on the Fourth Amendment claims.

In their motion for judgment as a matter of law, plaintiffs claim that probable cause arose early in the evening when Sargent Hitchcock first observed minors with alcohol at the scene and that the officers impermissibly created any exigency by unreasonably delaying in obtaining a warrant. The officers argue that probable cause did not arise until Officer Decker knocked on the front door and determined that no parent was at home, at which point there was no time to get a warrant. Plaintiffs also contend that, even if probable cause arose only at the front door, no court has accepted the safety justification offered by the officers as an exception to the warrant requirement in the context of an underage drinking party. To hold otherwise, plaintiffs maintain, would be to extend extraordinarily the law regarding legally cognizable exigent circumstances.

The officers assert qualified immunity, a defense that plaintiffs contend has been waived. As the parties agreed at oral argument on plaintiffs' motion, there are no longer any material factual disputes, and the motion raises only issues of law.

**3.** The Court charged the jury that, as a matter of law, there was no probable cause to believe that illegal drug activity was occurring in the house prior to entry.

*DISCUSSION*

### A. *Waiver*

As a threshold matter, plaintiffs argue that the officers have waived the defense of qualified immunity because they asserted it in only a conclusory fashion in their answer to plaintiffs' complaint[4] and did not mention it again throughout the trial or press it in any meaningful way until their opposition to the present motion. Specifically, plaintiffs point out that the officers did not flag the defense as a legal issue in the joint statement of the parties filed pursuant to Local Rule 16.1 of the Massachusetts District Court (Docket No. 15) and did not raise it at the summary judgment stage or while presenting the grounds for their motion for a directed verdict at sidebar.

Although the trial court should normally decide the immunity issue as early as possible, "defendants may raise a claim of qualified immunity at three distinct stages of the litigation": on the pleadings, in a motion for summary judgment, or at trial. *Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664, 667 (1st Cir.1996) (citing cases). " 'The last opportunity to raise [qualified immunity] is by motion for directed verdict.' " *O'Connor*, 117 F.3d at 17 (alteration in original) (quoting *Lewis v. Kendrick*, 944 F.2d 949, 953 (1st Cir.1991)), and then, if necessary, at the "judgment as a matter of law" stage after the jury has rendered its verdict, *see, e.g., Consolo v. George*, 58 F.3d 791, 794 (1st Cir.1995).

In the First Circuit, a trial court has the " 'discretion to find a waiver [of qualified immunity] if a defendant fails to assert the defense within the time limits set by the court or if the court otherwise finds that a defendant has failed to exer-

**4.** The officers' answer devoted one sentence to the defense: "By way of affirmative defense, the defendants state that the defendants' actions are entitled to a qualified good faith immunity." (Answer at 9.)

cise due diligence or has asserted the defense for dilatory purposes.'" *Guzman–Rivera*, 98 F.3d at 668 (quoting *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994), and adopting the Sixth Circuit's holding). A finding of waiver for one stage of the litigation does not necessarily mean that the defendant has waived the defense for other stages, however. *See id.* at 667–69. The critical inquiry is whether the defendant's timing in raising the defense prejudices the plaintiff by depriving him of sufficient notice of the qualified immunity argument. *See, e.g., Lynch v. City of Boston*, 180 F.3d 1, 13 n. 9 (1st Cir.1999) (finding no unfair surprise when the defendant introduced a qualified immunity defense in her renewed motion for judgment as a matter of law that she had "not distinctly articulated" in her motion for a directed verdict, given that she had asserted the defense in her answer, in the Joint Pre–Trial Memorandum, and in connection with proposed special verdict forms, and had discussed the relevant caselaw in several of her submissions to the court); *Ringuette v. City of Fall River*, 146 F.3d 1, 4 (1st Cir.1998) (analyzing the prejudicial effect of the defendant's failure to assert qualified immunity in his answer to the complaint).

Applying these standards to the instant case, the Court concludes that the officers have not waived their qualified immunity defense because they raised it in their written motion for a directed verdict (Docket No. 59). Plaintiffs can hardly claim surprise, because they themselves raised and addressed the issue of qualified immunity, both in their briefs supporting their motions for summary judgment and in their trial brief. In the trial brief, plaintiffs noted that the parties had engaged in some discussion at the pre-trial conference of which issues related to a qualified immunity defense would be appropriate for the jury to resolve; the brief also stated that defendants had expressed an intention at the conference to assert qualified immunity through a motion for a directed verdict. (Pls.' Trial Br. at 7.)

Although defendants' counsel certainly could have been more diligent in fleshing out the defense prior to the trial, plaintiffs were sufficiently apprised of the relevant legal issues and precedents throughout the course of the litigation, including the requirements of the state underage drinking statute on which the probable cause determination and so much else now hinges. The officers' claim of qualified immunity has not been waived. I proceed to set forth the standard for granting the defense and to apply it to the circumstances of this case.

### B. *Qualified Immunity Standard*

"Qualified immunity protects public officials from section 1983 civil liability so long as they 'acted reasonably under settled law in the circumstances.'" *Veilleux v. Perschau*, 101 F.3d 1, 2 (1st Cir.1996) (per curiam) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). The operative inquiry focuses on the "objective legal reasonableness" of the defendants' actions. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *accord Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.1995). That is, "[c]ould an objectively reasonable official, situated similarly to the defendant[s], have believed that his conduct did not violate the plaintiffs' constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?" *Wood v. Clemons*, 89 F.3d 922, 927 (1st Cir.1996); *accord St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir.1995); *see also Hegarty*, 53 F.3d at 1373 ("[Q]ualified immunity affords the defendant officers no safe haven unless an objectively reasonable officer, similarly situated, could have believed that the challenged police conduct did not violate the [plaintiffs'] constitutional rights." (citing *Burns v. Loranger*, 907 F.2d 233, 236 (1st Cir.1990))). "It is not enough for the constitutional right to be

'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law." *Ringuette*, 146 F.3d at 5 (citing *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998)). As long as the officer reasonably could have believed that his conduct was consistent with the plaintiff's constitutional rights, "[i]t makes no difference that a court ... later conclude[d] that the officer was mistaken." *Veilleux*, 101 F.3d at 3; *see also Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (finding that the qualified immunity doctrine "gives ample room for mistaken judgments").

■■■ The First Circuit has consistently maintained that, in regard to the issue of qualified immunity, "the objective reasonableness determination is for the judge to make, and not for the jury." *Hall v. Ochs*, 817 F.2d 920, 924 (1st Cir.1987); *accord Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991); *see also Tatro v. Kervin*, 41 F.3d 9, 15, (1st Cir.1994) (finding that the trial court's apparent attempt to "plac[e] some element of qualified immunity into the jury instructions" was improper).

### C. The Qualified Immunity Analysis

#### 1. Applicable Law

In applying the qualified immunity standard to this case, the Court must first consider settled law at the time of the officers' entry into plaintiffs' home. The Massachusetts statute prohibiting unsupervised underage drinking provided in 1996 (and still provides) that "[a] police officer may arrest without a warrant any person who violates [the statute]." Mass. Gen.L. ch. 138, § 34C (West Supp.1999). However, the statute cannot override the special protection that the Fourth Amendment of the United States Constitution affords to the home. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[T]he Fourth Amend-

ment has drawn a firm line at the entrance to the house."); *Buenrostro v. Collazo*, 973 F.2d 39, 43 (1st Cir.1992) (explaining the line drawn in the case law between the warrantless entry of a person's home and warrantless searches and seizures undertaken in "more public arena[s]"). " '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).

■■■ · It was firmly established well before 1996 that the Fourth Amendment prohibits the warrantless entry into a private residence to effect a search or arrest "except in exigent circumstances and with probable cause." *Hegarty*, 53 F.3d at 1373 (citing, *inter alia*, *Welsh*, 466 U.S. at 749, 104 S.Ct. 2091, and *Payton*, 445 U.S. at 586, 100 S.Ct. 1371). Probable cause exists when "the officers at the scene collectively possess[ ] 'reasonably trustworthy information [sufficient] to warrant a prudent [person] in believing that [the suspects] [have] committed or [are] committing a [criminal] offense.' " *Id.* at 1374 (second, third, and seventh alterations in original) (citation omitted) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *accord Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir.1992).

■■■ However, "[p]robable cause, without more, cannot legitimate a warrantless entry into a suspect's home." *Buenrostro*, 973 F.2d at 43 (citing *Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), and *Payton*, 445 U.S. at 587–90, 100 S.Ct. 1371). As was well-settled in 1996 and continues to be the case today, a warrantless home entry also requires the existence of exigent circumstances, which include:

(1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may

escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant. *Diaz v. City of Fitchburg,* 176 F.3d 560, 563 n. 4 (1st Cir.1999) (quoting *United States v. Tibolt,* 72 F.3d 965, 969 (1st Cir.1995) (citations and internal quotation marks omitted)).

 "[A] cognizable exigency must present a 'compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant.'" *Hegarty,* 53 F.3d at 1374 (second alteration in original) (quoting *United States v. Almonte,* 952 F.2d 20, 22 (1st Cir.1991)). "Conversely, certain mitigating factors may undermine a showing of exigent circumstances; for example, where the criminal offense was not sufficiently serious (a traffic violation)...." *Id.* (citing *Welsh,* 466 U.S. at 753 n. 6, 104 S.Ct. 2091).

 Finally, although the police need not apply for a warrant "the instant they have 'probable cause,'" *United States v. Beltran,* 917 F.2d 641, 643 (1st Cir.1990) (citing *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)), exigent circumstances "do not excuse the failure to secure a warrant when those circumstances are created by government officials who unreasonably and deliberately delay or avoid obtaining the warrant." *United States v. Rengifo,* 858 F.2d 800, 804 (1st Cir.1988) (citing cases).

As previously indicated, the parties no longer dispute whether the officers ultimately had probable cause to enter the Howes residence; rather, plaintiffs argue that this probable cause arose early in the evening and that the officers therefore had sufficient time to procure a warrant and cannot claim that exigent circumstances justified their entry. To prevail on their qualified immunity defense, the officers must first establish that a prudent police officer with the information they collectively possessed reasonably could have believed that probable cause to arrest the teenagers for illegal possession of alcohol did not arise until Officer Decker knocked on the front door and ascertained whether a parent was at home. *See Hegarty,* 53 F.3d at 1374 (describing the qualified immunity analysis in a warrantless arrest case). If they succeed, the officers then must establish that an objectively reasonable police officer could have believed that one or more of the above-enumerated exigent circumstances permitted their warrantless entry. *See id.* at 1375–76.

### 2. *Probable Cause*

 Plaintiffs contend that probable cause to believe that the partygoers were violating Massachusetts law arose shortly after 8 p.m. on July 3, when Sargent Hitchcock first observed minors carrying alcohol to and from the Howes residence. According to plaintiffs, these observations, together with the officers' knowledge of the neighbors' complaints that Pauline Howes was regularly absent from the home,[5] would constitute in the mind of a reasonable police officer the "'probability or substantial chance of criminal activity'" sufficient to conclude that probable cause existed. *United States v. Sawyer,* 144 F.3d 191, 194 (1st Cir.1998) (quoting *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

Plaintiffs' analysis gives short shrift to the fact that the statute prohibiting the possession of alcohol by minors makes the absence of supervision by a parent or legal guardian a key element of the offense. *See* Mass.Gen.L. ch. 138, § 34C (West Supp.1999). Aside from his knowledge of the residence's general reputation in the

---

5. Awareness of both the observations and the complaints is attributable to all the officers as a result of their meeting in the parking lot and the doctrine of collective knowledge. *See, e.g., Burns,* 907 F.2d at 236 n. 7 (discussing the "'fellow officer rule,'" under which "'joint knowledge of [suspects'] activities [can] legitimately be imputed to all the agents acting in concert'" (quoting *United States v. Zurosky,* 614 F.2d 779, 786 (1st Cir.1979))).

community as a wild party house where, often, no parent was home, Sargent Hitchcock gathered no information one way or the other during his initial surveillance on July 3 or from neighbors about whether Pauline Howes was present in her home *that night.* When he met the other officers in the parking lot, all he had to report was his belief that underage drinking was occurring at the house. He did not look directly inside the house and observe that the teenagers were unsupervised until the officers arrived back at the residence and Officer Decker was already at the front door. Moreover, based on information provided by her former husband to the police, the police were faced with the possibility that Pauline Howes was aware of the activities occurring at her home and permitted them when she was home. This possibility was consistent with one police officer's impression that Ms. Howes herself might have had a substance abuse problem.

■ True, a finding of probable cause does not require absolute certainty that a crime is being committed. *See, e.g., Sawyer,* 144 F.3d at 194 (noting that probable cause does not require " 'an actual showing of [criminal] activity' " (quoting *Gates,* 462 U.S. at 244 n. 13, 103 S.Ct. 2317)); *United States v. Khounsavanh,* 113 F.3d 279, 283 (1st Cir.1997) (emphasizing that " '[p]robability is the touchstone' " of the probable cause inquiry (quoting *United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988))). However, it does require more than mere suspicion. Even with the neighbors' and Mr. Howes's complaints of regular, unsupervised drinking, a police officer could reasonably believe that he would need more specific information about the whereabouts of the parent on the night in question before he had the requisite probable cause to obtain a warrant.

■ In light of these circumstances, an objectively reasonable police officer could have believed that probable cause did not exist until Officer Decker knocked at the front door and learned that no parent was home. The fact that Sargent Hitchcock believed that he had probable cause by 9 p.m. does not change this conclusion. The qualified immunity determination depends on an assessment of what an objectively reasonable police officer could believe under the governing law and the particular factual circumstances; the officers' subjective beliefs about the legality of the entry are not dispositive. *See, e.g., Anderson,* 483 U.S. at 641, 107 S.Ct. 3034.

■ As a result, plaintiffs' argument that the officers unreasonably delayed in securing a warrant falls flat. A police officer "does not avoid or delay applying for a warrant if he or she is conducting an investigation spurred by suspicion, but without, in her reasonable judgment, sufficient evidence to establish probable cause to support a warrant." *Rengifo,* 858 F.2d at 804 (citing *United States v. Ferrara,* 539 F.2d 799, 802–03 (1st Cir.1976)); *see also id.* ("[S]ince the agents did not have probable cause at least until the same event that created what they believed to be exigent circumstances, they did not improperly delay obtaining an arrest warrant."). *But cf., e.g., United States v. Curzi,* 867 F.2d 36, 42 (1st Cir.1989) (finding that exigent circumstances did not exist to justify a warrantless search of a dwelling where the agents had probable cause nearly two hours before the entry and where "each and all of the claimed extenuations existed from the time" the agents arrived at the dwelling).

3. *Exigent Circumstances*

■ With probable cause to believe that the teenagers were violating Massachusetts law, the police were permitted to enter the Howes residence without a warrant if one or more of the well-delineated emergency exceptions to the warrant requirement applied. Defendants pressed two types of exigent circumstances at trial: the risk of destruction of evidence and the dangers that unsupervised underage

drinking presents to teenagers and the public at large.

Citing precedent limiting cognizable threats to safety to those involving imminent danger to life or limb, *see, e.g., Good v. Dauphin County Soc. Servs.*, 891 F.2d 1087, 1094 (3d Cir.1989), plaintiffs argue that, as a matter of law, exigent circumstances cannot exist in a case involving merely an underage drinking party, at least on the facts presented in this litigation. At the time of the entry in this case, the Supreme Court had held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh,* 466 U.S. at 752–53, 104 S.Ct. 2091 (noting that, in 1984, most courts addressing the issue "ha[d] refused to permit warrantless home arrests for nonfelonious crimes" (citing cases)). The Court cautioned that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the [noncriminal, traffic offense of driving while intoxicated] at issue in [that] case, has been committed." *Id.* As a result, the Court did not accept the claimed need to preserve evidence as a justification for the officers' warrantless entry of the suspect's home to arrest him. *See id.* at 753–54, 104 S.Ct. 2091. The Court also dismissed the claimed threat to public safety presented by the possibility of drunk driving, but did so primarily on the ground that the suspect had already abandoned his car by the time the officers entered his home. *See id.* at 753, 104 S.Ct. 2091. The Court did imply, however, that its holding might have been different had the state classified the offense of driving while intoxicated as a crime and imposed more than civil fines for its commission. *See id.* at 754 & n. 14, 104 S.Ct. 2091

(noting that "the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense," an indication that can be "easily identified both by the courts and by officers faced with a decision to arrest").

Massachusetts classifies the offense of unsupervised underage drinking as a misdemeanor, punishable by a maximum fine of $50 for the first violation and a maximum fine of $150 for a second or subsequent violation. *See* Mass.Gen.L. ch. 138, § 34C (West Supp.1999). According to the First Circuit, however, "the fact that Massachusetts classifies the alleged violation ... as a misdemeanor does not reduce it to a 'minor offense.'" *Joyce v. Town of Tewksbury,* 112 F.3d 19, 22 (1st Cir.1997) (per curiam) (citing *Welsh* and finding that domestic violence offenses and violations of protective orders "are among the more grave offenses affecting our society"); *cf. Diaz,* 176 F.3d at 563 (refusing to hold that a warrantless custodial arrest "made [outside the home and] in the absence of 'exigent circumstances' for violation of an ordinance punishable only by fine always violates the Fourth Amendment's reasonableness requirement").

No case in Massachusetts or in the First Circuit has discussed the issue of exigent circumstances or *Welsh*'s holding specifically in the context of a teenage drinking party.[6] Other jurisdictions interpreting the Fourth Amendment, both at the time of the officers' entry into the Howes residence and more recently, have reached conflicting conclusions in these circumstances. *Compare State v. Jangala,* 154 Or.App. 176, 961 P.2d 246, 247–48 (1998) (holding, without discussing *Welsh* or the nature of the underlying offense, that the warrantless search of a home during a

---

**6.** The Massachusetts courts have considered the issue of exigent circumstances in the context of driving while intoxicated, however. *See Commonwealth v. DiGeronimo,* 38 Mass. App.Ct. 714, 652 N.E.2d 148, 152 (1995) (in-volving a similar factual situation to that in *Welsh* and finding no exigent circumstances to justify the warrantless entry into the apartment of a suspected drunk driver who had totally disabled his vehicle).

teenage beer party was justified where the police knew that the evidence was "easily destroyed" and the · "partygoers were aware of the police presence and had ... attempted to avoid detection"), *and State v. Johnston,* 184 Wis.2d 794, 518 N.W.2d 759, 766 (1994) (noting without holding that the warrantless search of a home during a beer party would likely have been justifiable by the existence of exigent circumstances because of the risk of the partygoers' discovery of the police presence and the destructibility of the evidence), *with People v. Olson,* 112 Ill.App.3d 20, 67 Ill.Dec. 663, 444 N.E.2d 1147, 1150 (1983) (holding that the warrantless entry of a home to make arrests for consumption of alcohol by minors was not permitted by exigent circumstances, in part because the suspected offense was a nonviolent misdemeanor), *and Commonwealth v. Roland,* 535 Pa. 595, 637 A.2d 269, 271–72 (1994) (holding that no exigent circumstances existed to support the warrantless entry of a home to investigate underage drinking because underage drinking is a "summary offense," not "a grave crime of violence" (citing, *inter alia, Welsh* )).

Sargent Hitchcock testified that one of the reasons he did not attempt or perceive a need to obtain a warrant before entering the home to make the arrests was the longstanding police practice in the community of breaking up teenage drinking parties without them. As a result, he believed that a clerk-magistrate would not entertain an application for a warrant at that point. Officer Decker also testified that he had previously entered dozens of homes without warrants to make arrests for underage drinking. Remarkably, the police officers did not seem to consider the Fourth Amendment's restrictions in deciding whether to enter the home. The Fourth Amendment did not cross their mind. Clerk–Magistrate William Casey of the Lynn District Court, who was on call on the night of July 3, 1996, provided some explanation for the officers' disregard for federal law. Although his testimony was not a paragon of clarity, Clerk–Magistrate Casey indicated that, in thirty-one years, he had never been asked by the police in any of the towns under his jurisdiction to issue a warrant to enter a residence to arrest underage drinkers. He stated that he did not think that a warrant was necessary in that situation and added that he had bailed out hundreds of teenagers who had been arrested for drinking during such warrantless home entries.

■■■ While this case is a useful wake-up call to the police that the Fourth Amendment applies to police home entries to stop teenage drinking parties, the question here is whether an objectively reasonable officer could have believed that exigent circumstances justified his entry into the Howes residence. First, an objectively reasonable officer in the circumstances faced by defendants could have concluded that, once Officer Decker knocked on the front door and spoke to several partygoers, many of the besotted the teenagers would have fled. Others would have attempted to destroy or at least conceal evidence of the teenagers' drinking had the officers waited patiently to obtain a warrant. *See, e.g., United States v. Wilson,* 36 F.3d 205, 210 (1st Cir.1994) (finding a sufficient threat of destruction of evidence where the officers had "reason to believe that [possible confederates of the suspects in a drug offense] had been notified of the police presence"); *United States v. Gerry,* 845 F.2d 34, 36 (1st Cir. 1988) ("The possibility that evidence will be destroyed by confederates who have discovered the constable is closing in is a well-recognized exigency."); *United States v. Edwards,* 602 F.2d 458, 468 (1st Cir. 1979) ("[T]he possibility that evidence will be destroyed by defendants who have discovered government surveillance of their activities often has been recognized as a sufficient exigency to justify warrantless entry." (citing numerous cases)).

Not surprisingly, Sargent Hitchcock observed teenagers running through the house and down to the basement at ap-

proximately the same time that Officer Decker knocked on the front door and alerted the partygoers to the police presence. Officer Lapham heard a bedroom window open and saw teenagers attempt to climb out while he was at the back of the house. Plaintiffs' counsel conceded at oral argument on this motion that, if probable cause did not arise until Officer Decker conversed with the Howes boys at the door, the threat of destruction of evidence was sufficient to permit the warrantless entry.

The officers' claim of a threat of imminent harm to life or limb is more difficult, because the officers did not actually observe anyone inside or around the house who was sick or fighting, *see Commonwealth v. DiGeronimo*, 38 Mass.App.Ct. 714, 652 N.E.2d 148, 155 (1995) (finding no exigent circumstances where the police of-ficer did not articulate any specific facts or take any actions that would suggest that he thought the safety of the suspect was in immediate jeopardy). However, police officers are entitled to rely on their experience in evaluating the threat to the lives of teens posed by a teenage drinking party involving numerous youths in a house well known for rowdy, late-night parties where no parent was present.

Both Sargent Hitchcock and Officer Decker testified that their training and experience with unsupervised teenage drinking parties had apprised them of the dangers of alcohol poisoning, accidents, and violence associated with such gatherings, as well as of the risk to public safety posed by the possibility of the partygoers getting into their cars. Sargent Hitchcock observed some of the teenagers drive away over the course of the evening.[7] The

---

7. A search of the Internet reveals a growing national focus on the problem of teenage drinking. *See, e.g.,* Keay Davidson, *South City Boy Found Dead in a Garage Is the Latest in a Rash of Recent Cases Across U.S.,* The San Francisco Examiner, Dec. 28, 1997 ("On Christmas morning, paramedics examined a youthful-looking body on the floor of a South San Francisco garage. The evening before, Ruben Castro, 15, had partied the night away in the 300 block of Holly Avenue. He became so drunk that someone helped him stagger to a couch."); Tom Farmer, *N. Andover Man Faces Charges in Party Death,* Boston Herald, Sept. 30, 1997 ("An intoxicated 17-year old North Andover girl who fell down a flight of stairs and fractured her skull during a Campion Road houseparty Friday night may have lain unattended for up to six hours while others parties around her, authorities said yesterday."); Eileen McNamara, *Youths Boozing and Losing,* Boston Globe, July 31, 1996 ("The hard reality is that alcohol abuse among teen-agers is at near epidemic levels in this country. For all of the national hand-wringing about illicit drugs, it is the contents of the family liquor cabinet that are killing our kids."); John Milne, *Binge Drinking Imperils Teens,* Boston Globe, Jan. 25, 1996 ("They call themselves the Misled Young Players, a bunch of kids who hang out together, and last Friday night John Geary went into the woods with them and they drank two bottles of vodka, half a gallon in all. Geary, half naked in a winter storm, barefoot and very drunk, died accidentally that night, po-lice said."); Larry Oakes, *Search for Bemidji Teen Focuses on Lake/Fellow Students Think He Jumped in to Flee Police Raid; Party's Host Is Charged,* Star–Tribune, June 2, 1998 ("A search continued Monday near Bemidji for the body of 18–year–old James Graves, who may have jumped into Big Turtle Lake when deputies raided a graduation party Friday night."); *Plymouth Mother Gets 30–Day Term,* The Boston Globe, Mar. 21, 1997 ("A Plymouth mother of five will serve a month in jail after admitting yesterday that she bought several cases of beer for her teenage son and his friends, two of whom drowned after drinking."); Richard Saltus & Ric Kahn, *Student in Alcohol–Induced Coma Dies,* Boston Globe, Sept. 30, 1997 ("A Massachusetts Institute of Technology freshman who went into a coma over the weekend after a bout of heavy drinking at a fraternity event died last night after being removed from life-support systems, police said."); *Teens and Booze Cocktail Recipe for Tragedy,* Syracuse Herald–Journal, Apr. 10, 1999 ("Unfortunately, teen drinking parties, in homes and in motels, are not uncommon. Drinking is seen as a tempting rite of passage. A national study of teenagers showed 54 percent of eighth graders, 72 percent of 10th graders and 82 percent of 12th graders admitted to drinking alcohol, more than one-third of high school seniors saw no great risk in downing four to five drinks a day, and 16 percent of teenagers have had blackouts."); Kate Zernike, *Girl, 14, Injured Evading Police/Drinking Party Raid Leads to Guest's Fall,* Boston Globe, May 27, 1996

*Welsh* Court did not directly have to confront this risk on the facts before it, but it recognized that "the prevention of drunken driving" may be "of major concern to the States." *Welsh*, 466 U.S. at 754 n. 14, 104 S.Ct. 2091; *see also id.* at 755, 104 S.Ct. 2091 (Blackmun, J., concurring) (identifying as a national concern "the continuing slaughter upon our Nation's highways, a good percentage of which is due to drivers who are drunk or semi-incapacitated because of alcohol or drug ingestion").

■ After applying a qualified immunity analysis, the Court concludes that the officers are entitled to immunity on both the claim that they unreasonably delayed in obtaining a warrant and the claim that their entry was not justified by exigent circumstances. An objectively reasonable officer could have believed that his entry into the house was lawful given the relevant precedents and the knowledge possessed by the police in this case. "[Q]ualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected...." *Hegarty*, 53 F.3d at 1373 (quoting *Hunter*, 502 U.S. at 229, 112 S.Ct. 534); *see also Ringuette*, 146 F.3d at 5 (finding it "enough for qualified immunity" that the police decision in that case was not "so manifestly unreasonable a 'seizure' that any reasonable police officer should have regarded it as such" (citing *Joyce*, 112 F.3d at 22–23)).

### D. *Municipal Liability*

■ Because there is still a pending claim of municipal liability, the Court must determine whether the constitutional rights of plaintiffs were violated. Although police, when breaking up teenage drinking parties, are not exempt from the requirements of the Fourth Amendment, once probable cause arose to believe that

there was a violation of Mass.Gen.L. ch. 138, § 34C, the police were presented with exigent circumstances involving concealment of evidence and teenage safety that justified the warrantless home entry. Accordingly, the municipal liability claim is not viable.

### ORDER

Plaintiffs' motion for judgment as a matter of law or for a new trial (Docket No. 66) is ***DENIED***. The Court orders entry of judgment for the defendants on all claims.

---

("Spencer police arrested 25 teen-agers Friday for drinking at what was apparently an unchaperoned "sweet 16" birthday party and planned to charge a parent of one of the youths with buying the alcohol.... As police

began making arrests, some of the teen-agers climbed out a back window and onto a ledge, and then onto a porch below. The 14-year-old ... fell as she climbed out.").