Brent CUMMINGS, Plaintiff,

v.

Officer Charles D. LIBBY, III,
and Officer James Keddy,
Defendants.

No. 01–32–P–H.

United States District Court,
D. Maine.

Dec. 20, 2001.

Peter E. Rodway, Rodway & Horodyski, Michael J. Waxman, Portland, ME, for Brent Cummings.

Mark E. Dunlap, Norman, Hanson & Detroy, Portland, ME, for Charles D. "Chuck" Libby, III, Portland Police Officer, Officer James Keddy, Portland Police Officer.

## ORDER ON DEFENDANT LIBBY'S MOTION FOR NEW TRIAL AND REMITTITUR

HORNBY, Chief Judge.

Officer Charles D. Libby, III, has moved for a new trial on two grounds: first, that he was unfairly and incurably prejudiced by the admission of evidence concerning what other police officers did on the night in question; second, that the damage award ($15,184 compensatory; $37,916 punitive) is excessive. Alternatively he asks for a remittitur. The motion for new trial and remittitur is DENIED.[1]

### ADMISSION OF EVIDENCE

■ It was clear from the outset of this case that the evidence could not be limited solely to what the two defendant police officers and the single civilian plaintiff saw and did during the few moments their paths crossed in the early morning hours of July 31, 2000. The incident happened in or adjacent to the parking lot of the Brian Boru pub near the corner of Fore and Center Streets on a warm summer night when the Old Port area of the City of Portland was packed with people as a result of the "tall ships" being in port. First, the defendants made clear—in both their summary judgment motion and their trial brief—that they considered highly relevant (and wanted the jury to hear) what Officer Libby and other officers had confronted in the Old Port area that night—specifically, an almost uncontrollable fight down near Bill's Pizza (on the corner of Commercial and Dana Streets) and an exchange with a group of young people near the corner of Fore and Cross Streets—both events preceding the confrontation of these particular parties. Second, the defendants conceded that the plaintiff had to be allowed to tell the jury what he had seen and done so that the jury could understand his version of the (conflicting) facts, just as the officers wanted to tell the jury what they had seen and done to explain their version. Third, the events that prompted the lawsuit took place over the course of only a few minutes, and it would have been well nigh impossible to slice and dice the witnesses' testimony to permit the defendants to testify about all of what they saw and did, and the plaintiff to testify about all of what he saw and did, yet limit the remaining witnesses to only what they saw the identified defendants do specifically to this plaintiff, thus preventing corroboration[2] or contradiction of the other testimony and requiring artificial gaps in the narratives those

---

1. The defendant also argued in his motion that I unfairly allowed into evidence the fact that all charges against the plaintiff had been dismissed, while excluding from evidence the fact that the young man (Tucker Cianchette) who arguably started everything was convicted of one charge (disorderly conduct). In his reply, the defendant concedes that the dismissal of all charges against the plaintiff came in by stipulation, not by a ruling. I stand on the reasons given on the record at the trial for sustaining the plaintiff's objection to the introduction of the Cianchette conviction.

2. Except for Bruce Shoebottom, a Brian Boru bouncer, the other witnesses provided strong corroboration to the plaintiff's version of what had taken place—that he was an innocent bystander trying to document police misconduct and was unjustifiably attacked by Officer Libby. They also weakened the defendants' version of how difficult the crowd control issues really were, an important contex-

witnesses would otherwise tell. Fourth, the night was dark, lighting was uncertain, and in the confusion some witnesses could not be confident of their identification of who was doing what; the jury could sort matters out only by hearing it all. In this context, I concluded early in the trial that the only solution was to allow the witnesses to describe the general police/civilian interaction during the few minutes in the Brian Boru parking lot, with frequent reminders to the jury that their concern was only for what these particular defendants did or did not do to this particular plaintiff, and that the other information was only to provide a context so that they could understand the situation.[3] I am satisfied that the jury was able to do just that. Their affirmative body language each time I repeated the cautionary instruction persuaded me that they understood fully the significance of my comments. The outcome—different verdicts for the two defendants—confirms that the jury was able to distinguish among police officers and did not automatically attribute all negative testimony against every available police officer. (Moreover, defense counsel did some very skillful cross-examination that narrowed significantly any expansive comments that may have been made on direct. See, e.g., Trial Tr. at 121–22). The admission of this evidence is not a ground for a new trial.

## DAMAGES

 Alternatively, Officer Libby asks for a remittitur of the damages award as excessive and unfairly inflated by the evidence I have just discussed. It was not error to admit that evidence, for the reasons I have stated. Moreover, the damages award is not excessive. The plaintiff had reasonable medical expenses of $ 184. He also introduced persuasive evidence of pain, humiliation and fear. A compensatory award of $ 15,184 is not unreasonable, as verdicts go. On the issue of punitive damages,[4] the jury could find the following: The plaintiff was an innocent

---

tual element in assessing the reasonableness of the officers' response.

3. Having ruled, I told the defendants' lawyer that he did not need to object each time a witness described an interaction other than that involving the plaintiff and the defendants unless he had a new ground for objection. In the direct examination of witness Burbank, the plaintiff's lawyer went beyond the contextual premise I had allowed and proceeded to focus on Burbank's alleged injuries and, when the defendant's lawyer did not object, I called the lawyers to sidebar on my own and discontinued the line of questioning. See Trial Tr. at 217.

4. There is a procedural matter that bears clarification, which may be helpful in the event of an appeal. At the outset, this trial involved claims for both compensatory and punitive damages. At the close of the plaintiff's case, the defendants moved for judgment as a matter of law, then proceeded to raise the evidentiary unfairness that is now the subject of their motion for a new trial. I pointed out that the latter was really a motion for a mis-trial, not for judgment as a matter of law, and denied both motions. The plaintiff's lawyers then informed me of some evidentiary issues that would come up in their cross-examination of the police officers that related to punitive damages issues (specifically departmental discipline or failure to discipline the officers). At that point I severed the punitive damages issue from the rest of the trial. After both sides rested finally, in what was now a trial on only liability and compensatory damages, I asked the defendants' lawyer if he renewed his motion for judgment as a matter of law. He did, and I denied it. Thereafter, at the jury charge conference (which was not on the record), the subject came up of the remaining evidence on the punitive damages claim. The plaintiff's lawyers stated that they had decided against introducing additional evidence (specifically, the (non)discipline evidence) and would prefer to have the punitive damages claim go to the jury at the same time as liability and compensatory damages. The defendants' lawyer acceded. A punitive damages instruction was then added (by agreement of the parties) to the jury charge and

bystander, doing nothing to provoke the police except for the fact that he was expressing concern about police misconduct against others and calling out to his friend (so they would both remember) the license plate numbers of the police vehicles. The jury could find that this attempt to "document" police misconduct is what angered Officer Libby and led him to tackle the plaintiff to the ground (with resulting injuries) even though at the time of the tackle the plaintiff was walking away, as ordered, with his hands in the air. The jury was entitled to conclude that only an award of punitive damages would deter Officer Libby, and other officers, from such conduct in the future. The award of $37,916 to send that message is not excessive.

## CONCLUSION

This was a relatively short trial, but anyone who listened to all the testimony would quickly recognize that most ordinary citizens have no idea what police officers have to deal with while the rest of us are asleep. On the night in question, Portland police were clearly outnumbered.

With abundant alcohol and crowds, violence was waiting to happen in Portland's Old Port area. The record does not disclose why more police officers were not present during such a huge summer event as OpSail, involving the presence of the tall ships and thousands of visitors. But it is understandable that police officers rushing from crisis to crisis—according to the testimony, wading into a fighting crowd, breaking up fistfights and being unable to arrest because there was no one to take custody of arrestees—might, as human beings, break, lose their professional detachment and react unreasonably and uncontrollably in anger and violence.[5] On the evidence presented here, the jury was entitled to conclude that Officer Libby did just that, and that Cummings, an innocent bystander, became a victim of Officer Libby's use of constitutionally unreasonable force. For that, on this record, he is entitled to have his damages award stand.

**SO ORDERED.**

presented to the jury. This explains why, although the punitive damages issue was severed from the liability and compensatory damages issues and never, on the record, rejoined, the instructions and verdict included all three issues. It also bears mention that, for similar reasons, there was never a formal motion for judgment as a matter of law on the punitive damages claim at the close of all the evidence. After the charge conference, I should have offered both sides the opportunity on the record to close their punitive damages case finally and the defendants the resulting opportunity to move for judgment as a matter of law on the punitive damages claim. However, I overlooked that step the next morning (no lawyer brought it to my attention) and proceeded directly to the jury charge.

5. I did not instruct the jury on qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001),

held that qualified immunity is a separate inquiry from the unreasonable force inquiry. Although a judge ordinarily deals with qualified immunity in the early stages of a case, it is uncertain in the First Circuit what role the jury has if the issue stays in the case until trial. *See, e.g., Tatro v. Kervin*, 41 F.3d 9, 15 (1st Cir.1994) ("should not be decided by the jury" but recognizing that a jury might be asked for specific findings); *Ringuette v. City of Fall River*, 146 F.3d 1, 6 (1st Cir.1998) (the jury's role is a "black hole"); *St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 n. 1 (1st Cir.1995) (respective role of judge and jury "appears not to have been clearly decided by the Supreme Court"). In any event, at the charge conference the lawyers agreed that a qualified immunity charge (or special interrogatories) should be omitted in light of the facts of this case and accordingly there was no objection to the jury instruction.