**POLYCARBON INDUSTRIES, INC., CGU Insurance Company as Subrogee, Brian Flory and Linda Flory, Plaintiffs,**

v.

**ADVANTAGE ENGINEERING, INC., and American Electronic Components, Inc., d/b/a Durakool, Inc., Defendants**

No. CIV.A.00–40010–CBS.

United States District Court, D. Massachusetts.

April 18, 2003.

Keith A. Minoff, Robinson, Donovan, Madden & Barry, Springfield, MA, John A. Donovan, Jr., Kevin G. Kenneally, Donovan & Hatem, LLP, Boston, MA, John E. Garber, Weinberg & Garber, P.C., Northampton, Donovan & Hatem, LLP, Boston, MA, for Polycarbon Industries, Inc., CGU Insurance Company, as Subrogee, Brian Flory, Linda Flory, Plaintiffs.

Scott L. Machanic, Cunningham, Machanic, Cetlin & Johnson, LLP, John W. McCann, Cunningham and Machanic, Natick, John F. Rooney, Amy E. Goganian, Melick, Porter & Shea, LLP, Boston, MA, for Advantage Engineering, Inc., American Electronic Components, Inc. aka Durakool, Inc., Defendants.

## *MEMORANDUM AND DECISION ON PLAINTIFFS' CHAPTER 93A CLAIM AND PLAINTIFFS' POST-TRIAL MOTIONS AND ORDER FOR JUDGMENT*

SWARTWOOD, United States Magistrate Judge.

### *Nature of the Proceeding*

Following an adverse jury verdict on their breach of warranty and tort claims, the Plaintiffs, Brian Flory and Linda Flory, have filed a Motion For Judgment As A Matter Of Law Pursuant To Rule 50 After Trial And/Or Motion For New Trial (Docket No. 166). Additionally, Mr. Flory asserted a claim against the Defendants under the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A ("Chapter 93A"), which I reserved for decision. This memorandum and decision addresses the Plaintiffs' post trial motions and Mr. Flory's Chapter 93A claim.

### *Background*

This action was originally commenced by: (i) an insurance company, as subrogee to PolyCarbon Industries, Inc. ("PolyCar-bon"), which sustained property damage to its plant in Leominster, Massachusetts, as a result of an explosion at that plant on October 21, 1997; and (ii) Brian Flory and his wife, Linda Flory, for damages sustained by them as a result of injuries suffered by Brian Flory in that same explosion. The named Defendants were the manufacturer of the temperature controller that allegedly caused the explosion, Advantage Engineering, Inc. ("Advantage") and a manufacturer of a component part of the temperature controller, American Electronic Components, Inc. d/b/a Durakool, Inc. ("Durakool"). Prior to trial, this action was dismissed as to Durakool and the insurance company's property damage claim was settled. Therefore, the only remaining parties who proceeded to trial were Brian and Linda Flory as Plaintiffs and Advantage, as the sole Defendant. On June 27, 2002, the jury returned a general verdict finding that:

1. Advantage did not "breach the implied warranty of merchantability with respect to the design of the Advantage Regal Hot Oil Temperature Controller ('Temperature Controller')";

2. Advantage did "breach the implied warranty of merchantability with respect to a manufacturing defect in the Temperature Controller", but that breach was not "a substantial contributing factor in producing Mr. Flory's injuries";

3. Advantage did not "breach the implied warranty of merchantability by failing to provide adequate warnings for the Temperature Controller";

4. Advantage did not "breach a warranty of fitness for a particular purpose";

5. Advantage did not "breach an express warranty concerning the Temperature Controller";

6. Advantage was not "negligent with respect to the design of the temperature controller";

7. Advantage was "negligent with respect to the manufacture or re-conditioning of the Temperature Controller", but that such negligence was not "a substantial contributing factor in producing Mr. Flory's injuries"; and

8. Advantage was not "negligent by failing to provide adequate warning for the Temperature Controller".

*See* the Jury's answers to *Special Questions* (Docket No. 165).

*Findings of Fact*

1. In the fall of 1993, Advantage sold two Regal Hot Oil Temperature Controllers, Model HSO–1830, bearing Serial Numbers 10071 and 10072, to E.W.I. Inc. ("E.W.I.") in South Bend, Indiana.

2. Such temperature controllers were designed for use in the plastics industry and specifically, for mold applications. Plastics, if overheated, generally do not explode or endanger personnel. Rather, the consequence of overheating plastics is that the product itself is damaged.

3. Both of these temperature controllers experienced operational problems while at E.W.I.

4. On September 14, 1994, an Advantage employee went to E.W.I. and replaced the heater on the temperature controller (Serial No. 10072), which ultimately became the subject of this lawsuit ("the subject temperature controller").

5. While at E.W.I., the subject temperature controller did not control temperature properly, was determined by E.W.I. to be defective and was returned to Advantage under warranty in February 1995.

6. Documentation of this transaction was received and maintained by Advantage which indicated that the subject temperature controller was defective, that E.W.I.'s warranty claim was being accepted and the subject temperature controller was replaced by another unit under warranty. Advantage documents indicate that the subject temperature controller was to be repaired and returned to stock.

7. Edward Price is a chemical engineer, who for a period of time worked at ChemDesign, as a plant manager, and who at some time in 1995, determined that he was going to start his own business (Poly-Carbon). Mr. Price contacted Advantage's sales agent, Mr. Bower, about purchasing a temperature controller to use in his start-up business.

8. Mr. Bower was Advantage's Massachusetts sales representative authorized to solicit business from customers engaged in industrial processes such as chemical manufacturing.

9. Mr. Bower had known Mr. Price at ChemDesign and knew that Mr. Price was involved in a start-up chemical manufacturing business and that he intended to use the temperature controller in that business. Mr. Bower directed Mr. Price to contact Advantage.

10. Mr. Bower did not sell Advantage products to company's in the plastic's industry (which is the industry to which Advantage primarily sold Regal Hot Oil Temperature Controllers). That business was handled by other sales representatives.

11. Mr. Price contacted Advantage and spoke with Glenn Oswalt and Sean Tuell concerning the purchase of a temperature controller. Mr. Price was told by either Mr. Oswalt or Mr. Tuell that Advantage had available for sale a temperature controller that had not been in industrial service, but had been used at a trade show (referring to the subject temperature controller). Either Mr. Oswalt or Mr. Tuell

faxed Mr. Price a brochure concerning temperature controllers in the summer of 1995. After reviewing that material and following his conversations with Messrs. Oswalt and Tuell, Mr. Price purchased the subject temperature controller for a discounted price of $3,000.

12. Mr. Price probably would have purchased the subject temperature controller if he had known that it had previously been used in industrial use, rather than at a trade show.

13. Mr. Oswalt knew that Mr. Price was purchasing the subject temperature controller for a non-plastics application, as did Harold Short, Executive Vice President of Advantage, who authorized the sale at a reduced price.

14. Mr. Bower received an eight percent commission from Advantage for the sale of the subject temperature controller to Mr. Price.

15. Advantage personnel could have searched E.W.I.'s customer file to obtain information about the history of the subject temperature controller, but did not do so.

16. Mr. Price was not told that the subject controller had been returned by E.W.I. as defective, nor was he told that the subject temperature controller could not reliably hold temperature.

17. Advantage records clearly establish that the subject temperature controller was never repaired or tested prior to it being sold to PolyCarbon. Testimony at trial further supports a conclusion that no repairs had been made to the subject temperature controller after it was returned from E.W.I. to Advantage.

18. Mr. Price received delivery of the subject temperature controller in September 1995 and stored it at an off-sight location until he started PolyCarbon in the spring of 1997.

19. Brian Flory went to work for Poly-Carbon in the late summer of 1997 and was the fourth employee hired by PolyCarbon.

20. PolyCarbon first started to use the subject temperature controller in early to mid-September 1997.

21. After the subject temperature controller was installed at PolyCarbon, there were problems with the unit when it would suddenly turn off and not operate. PolyCarbon personnel called Advantage and Advantage, without having anyone going to PolyCarbon's facility to examine the subject temperature controller, merely advised PolyCarbon personnel to add oil to the tank.

22. On October 21, 1997, Mr. Flory was on duty in PolyCarbon's chemical manufacturing facility where he was monitoring the drying process for the chemical HOAt (1–hydroxy–7–AzaBenzoTriazole). HOAt undergoes dangerous thermal decomposition and explodes when exposed to elevated temperatures.

23. On that day, the subject temperature controller was located in one room and as designed, provided heat to a stokes oven located in the adjacent room, which in turn dried the HOAt material. Suddenly, the stokes oven exploded and Brian Flory, who was standing in front of the stokes oven between the oven and the outside wall of the building, was blown across the room and severely burned. Additionally, the explosion caused considerable property damage to PolyCarbon's building.

24. Prior to the explosion, Brian Flory was taking readings of the various gauges attached to the stokes oven every fifteen minutes and recording those readings.

25. Approximately fifteen to twenty minutes before the explosion, Mr. Price went through the area, where the stokes

oven was located, on a tour with customers and noted that at that time, the temperature gauge showed a temperature of 121 degrees Fahrenheit.

26. One or two minutes before the explosion, Mr. Flory noted that the temperature gauge showed a temperature reading in the vicinity of 120 degrees.

27. An exhibit admitted into evidence indicated that HOAt would decompose (explode) at 410 degrees and various experts testified that it would be practically impossible for the subject temperature controller to increase the heat in the stokes oven from 120 degrees Fahrenheit to 410 degrees Fahrenheit in such a short time or, in fact, a temperature even approaching 410 degrees Fahrenheit.

28. Mr. Flory presented testimony/evidence that: the design of the subject temperature controller was flawed, in that there was no mechanism to prevent its overheating to a point where chemical products would explode; there was no way to determine from the temperature gage whether the temperature indicator had gone 360 beyond the temperature indicated on the face thereof (that is, whether the temperature had gone beyond 120 and then passed 0 and once again come to rest at approximately 120 ); the Durakool relays in such temperature controllers can and have intermittently failed and upon inspection afterwards, appeared to operate normally (if the relay fails to operate properly, the heater will not turn off once the required temperature has been reached); Advantage failed to provide adequate warnings to Mr. Flory with respect to use of the subject temperature controller and failed to insure that alarms were installed to warn those using such temperature controllers of excessive heat which could potentially result in an explosion depending on the material being heated; and Advantage personnel were negligent in not in-

forming PolyCarbon that the subject temperature controller was defective and had previously been returned to Advantage on a warranty claim.

29. I concur with the juries' finding that Advantage breached a warranty and was negligent as the result of manufacturing defects in the subject temperature controller and that Advantage was negligent with respect to repair/re-conditioning of the subject temperature controller. I further find that the Plaintiffs introduced credible evidence which would have supported a finding that the subject temperature controller was the sole cause of the explosion which resulted in the Plaintiffs' injuries.

30. Advantage presented some credible evidence that the explosion could not have occurred as a result of overheating by the subject temperature controller and that the explosion was caused by some other phenomenon. Specifically, one of Plaintiff's experts testified that he had eliminated static electricity as a potential cause of the explosion, but on cross-examination, the expert admitted that he had not checked that the ground wire was securely attached to prevent an explosion caused by static electricity. Another expert witnesses testified that an explosion could have occurred as a result of contaminated HOAt being dried in the oven at the time of the explosion.

31. The evidence presented by Advantage was sufficient to support a finding by the jury that the explosion occurred as a result of some cause other than overheating of the temperature controller.

32. On June 2, 1998, Advantage issued a Product Service Bulletin and retrofit safety device due to concerns that relay contacts could fail after two years of use. Initially, Advantage claimed that the relays on the subject temperature controller

had been replace while at E.W.I. (and, therefore, had not been in use for two years at the time of the explosion). However, Advantage ultimately conceded that this was not the case.

33. Brian Flory suffered serious injuries as the result of the explosion, including severe physical and emotional harm (including anxiety, depression and stress disorder) and disfigurement (scarring).

34. Mr. Flory incurred lost earnings in the amount of approximately $15,330 and reasonable and necessary medical expenses in the amount of $9,729.65. Mr. Flory alleged that he also suffered diminished earning capacity. However, I find that the evidence submitted by Mr. Flory on this issue was speculative.

35. On February 3, 1998, counsel for Mr. and Mrs. Flory sent a demand for relief letter to Advantage in accordance with Mass.Gen.L ch. 93A, § 9. Advantage never responded to that letter. No offer of settlement was ever made by Advantage to Mr. and Mrs. Flory until May 2002, when an offer of $90,000 was made, which offer was later increased to $120,000 just before trial. Those offers were rejected by Mr. and Mrs. Flory as their attorney's fees and expenses incurred as of the date such offers were made far exceeded the offers.

36. During discovery, Mr. and Mrs. Flory sought production from Advantage of documentation concerning the history of the subject temperature controller. However, Advantage failed to produce any of the documentation concerning the prior sale to E.W.I. of the subject temperature controller, E.W.I.'s rejection of that unit because it was defective, Advantage's acceptance of E.W.I.'s warranty claim and Advantage's replacement at E.W.I. of the subject temperature controller. The Florys' counsel obtained documentation from E.W.I. concerning the subject temperature controller. Thereafter, the Florys again demanded from Advantage production of documents related to the E.W.I./Advantage transactions involving the subject temperature controller. It was only at this time that Advantage produced the previously requested documentation.

### Discussion

At the end of all the evidence, Mr. and Mrs. Flory filed a Motion For Judgment As A Matter Of Law By Plaintiffs Brian and Linda Flory Against Advantage Engineering, Inc. (Docket No. 156), which I denied. The Florys have now filed a Motion By Plaintiffs Brian Flory and Linda Flory For Judgment As A Matter Of Law Pursuant To Rule 50 After Trial And/or Motion For New Trial (Docket No. 166). As part of his Amended Complaint, Mr. Flory has filed a Chapter 93A claim against Advantage.

### I. Plaintiffs' Motion For Judgement As A Matter of Law/New Trial

#### A. Plaintiffs' Renewed Motion For Judgment As A Matter Of Law

In cases in which the jury has returned a verdict, the court, in ruling on a renewed motion for judgment as a matter of law, may (1) let the verdict stand, (2) enter judgment as a matter of law for the moving party, or (3) order a new trial. Fed.R.Civ.P. 50(b). In ruling on such motion, the court considers the facts in a light most favorable to the jury's verdict. *See Howes v. Hitchcock,* 66 F.Supp.2d 203, 207 (D.Mass.1999)(citing *O'Connor v. Huard,* 117 F.3d 12 (1st Cir.1997)). *See also Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 436 (1st Cir.1997)(in determining whether to grant judgment as matter of law, court examines evidence adduced at trial in light most favorable to non-moving party, drawing all reasonable inferences in non-moving party's favor). Furthermore,

"[a] federal district court may not set aside the jury verdict and direct the entry of a contrary verdict, unless no reasonable jury could have returned a verdict adverse to the moving party." *Morrison,* 108 F.3d at 436; *see also McKeown v. Woods Hole,* 9 F.Supp.2d 32, 36 (D.Mass.1998) (jury verdict may not be set aside under Rule 50(b) unless court finds evidence could lead reasonable person to only one conclusion).

■ The Plaintiffs offered evidence which would establish that the subject temperature controller was the sole cause of the explosion. However, Advantage introduced evidence and solicited testimony from its own experts, as well as Plaintiffs, that there were other possible causes for the explosion. The Plaintiffs had the burden of establishing, by a preponderance of the evidence, their theory that the subject temperature controller was the cause of the explosion and, consequently, their injuries. Obviously, in light of its decision, the jury found that the Plaintiffs failed to carry that burden. While reasonable minds could disagree with the jury's verdict, it is not the role of this Court to substitute its judgement for that of the jury. Rather, the jury's verdict as to each of the Florys' claims must stand unless no reasonable jury could have found against the Florys with respect to such claims. Because Advantage introduced credible evidence that the subject temperature controller did not cause the explosion, I cannot find that the jury's verdict against the Florys was unreasonable. Therefore, Mr. and Mrs. Flory's renewed motion for judgment as a matter of law is denied.

### B. *Mr. and Mrs. Flory's Motion For A New Trial*

A new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ..." Fed. R.Civ.P. 59(a)(1). The Supreme Court has stated that:

'The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of the alleged substantial errors in admission or rejection of evidence or instructions to the jury.'

*Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc.,* 86 F.3d 1260, 1262–63 (1st. Cir.1996) (quoting *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940)).

Reasonable people could disagree as to whether Mr. and Mrs. Flory proved by a preponderance of the evidence that they were entitled to recover on one or more of their claims. However, for the same reasons stated in my denial of the Plaintiffs' renewed motion for judgment as a matter of law, I do not find it appropriate in this case to second guess the jury's verdict or substitute my judgment for that of the jury by finding that the verdict is against the weight of the evidence. Therefore, Mr. and Mrs. Flory's Motion For A New Trial is denied.

### II. *Mr. Flory's Chapter 93A Claim*

#### A. *Whether Advantage Violated Chapter 93A*

Chapter 93A "makes it unlawful to engage in '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce'". *Saint–Gobain Indus. Ceramics Inc. v. Wellons, Inc.,* 246 F.3d 64 (1st Cir.2001)(quoting Mass.Gen.L. ch. 93A, § 2). Chapter 93A applies to business transactions involving commercial and/or private parties. *Id.* In this case, Mr. Flory

asserts that the circumstances of Advantage's sale of the subject temperature controller to PolyCarbon violated Chapter 93A and ultimately led to his injuries.[1]

■ With respect to Mr. Flory's tort and breach of warranty claims, the jury found that the subject temperature controller was defective, but that Advantage's breach of warranty/negligence was not the cause of the explosion which resulted in Mr. Flory's injuries. However, " 'a judge may make independent and, therefore, different, findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims' ". *Poly v. Moylan*, 423 Mass. 141, 151, 667 N.E.2d 250, 257 (1996). In other words, this Court is not bound by the jury's finding that defects in the subject temperature controller were not the cause of the explosion.

Chapter 93A liability must be decided on a case-by-case basis to determine whether unfair or deceptive acts or practices were employed in a given transaction to gain an unfair advantage. *Id.* The court's primary focus should be on "the nature of challenged conduct and on the purpose and effect of that conduct." *Massachusetts Employers, Ins. Exch. v. Propac–Mass., Inc.*, 420 Mass. 39, 42, 648 N.E.2d 435, 438 (1995). Furthermore, "[w]hile Chapter 93A 'was designed to encourage more equitable behaviour in the market-place and impose liability on persons seeking to profit from unfair practices, ... [it] does not contemplate an overly precise standard of ethical or moral behavior.' Nevertheless, it is clear that 'Chapter 93A liability may exist if the defendant's conduct falls "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or is "immoral, oppressive or unscrupulous' " ". *Saint–Gobain*, 246 F.3d at 73 (citation to quoted cases and internal citation omitted).

Mr. Flory contends that Advantage violated Chapter 93A by:

1. Misrepresenting to PolyCarbon that the subject temperature controller had been a trade show model that had not been in industrial use, when, in fact, the subject temperature controller had been returned by E.W.I. as a defective unit;

2. failing to inform PolyCarbon that because the unit had been designed for use in the plastics industry, where the consequences of overheating are minimal (even though Advantage knew that Mr. Price was seeking a temperature controller for use in a chemical business), the subject temperature controller did not include safety devices such as auto-shut offs or alarms; and

3. failing to include adequate warnings with the subject temperature controller.

---

1. In order to invoke Chapter 93A, the plaintiff must establish that the alleged unfair and deceptive acts and practices occurred primarily and substantially in Massachusetts. In this case, Mr. Price, who was located in Massachusetts, initially contacted Advantage's sales representative for the area covering Massachusetts. Mr. Price, while still in Massachusetts, then contacted other Advantage personnel for the purpose of purchasing a temperature controller to be shipped to Massachusetts. Advantage personnel made representations and faxed information to Mr. Price in Massachusetts concerning the subject temperature controller. Mr. Price ultimately purchased the subject temperature controller and it was shipped to a location in Massachusetts. The subject temperature controller was installed at PolyCarbon, in Massachusetts and the explosion occurred in Massachusetts. Under these circumstances, I find (and Advantage does not contest), that Mr. Flory has established a sufficient nexus to Massachusetts to allege a Chapter 93A claim against Advantage.

■ Although the subject temperature controller was designed for use in the plastics industry, I agree with Mr. Flory that given that Advantage knew at the time that it sold the subject temperature controller to Mr. Price that it would be used in his chemical business, the subject temperature controller should have contained adequate warnings with respect to the possibility of an explosion if materials were overheated. Furthermore, the subject temperature controller should have included safety devices such as an alarm system which would have forewarned those using it as to any overheating problem, and/or some sort of automatic shut-off mechanism. However, I do not find that the failure of Advantage to provide such warnings or to include such safety devices constituted an unfair or deceptive act or practice.

■ The question thus becomes whether Mr. Flory has established that Advantage engaged in unfair and deceptive acts and practices under Chapter 93A by representing to Mr. Price that the subject temperature controller had never been in industrial service and had only been used at a trade show. Advantage asserts that such representation did not induce Mr. Price to purchase the subject temperature controller as evidenced by his testimony that he wanted to purchase a temperature controller at a reasonable price and, in all likelihood, would have purchased the subject temperature controller even if he had been told that it had previously been used in industrial service. Therefore, Advantage argues, such conduct cannot give rise to liability under Chapter 93A. For the reasons set forth below, I disagree.

I find that Advantage employees who sold the subject temperature controller to Mr. Price, knew[2], that: the subject temperature controller had, in fact, been in industrial use at E.W.I. for almost two years; there were operational problems associated with the subject temperature controller at E.W.I.; E.W.I. returned the subject temperature controller to Advantage, as defective; Advantage accepted back the subject temperature controller under warranty and replaced the subject temperature controller with a new temperature controller; and the subject temperature controller, once returned to Advantage, was placed in inventory without repair, re-conditioning or retesting before it was sold to Mr. Price.

Based on the evidence before me and Advantage's overall actions in the sale of this product and its conduct during this litigation, I find that Advantage employees made the representation that the subject temperature controller was a trade show model not to conceal the fact that it had previously been used in industrial service, but to conceal the fact that it had been returned under warranty as defective because it was not able to maintain proper temperature. At the very least, by making this representation, Advantage employees deterred Mr. Price from inquiring as to whether the subject temperature controller had performed properly when in service. I further find that contrary to its own policy, Advantage knowingly sold the subject temperature controller to Mr. Price without having repaired, re-conditioned or retested the unit after receiving it back from E.W.I. as defective. This case fits squarely within those Massachu-

2. Advantage is a small company. At the time that Mr. Price purchased the subject temperature controller, there was available to Advantage employees documentation concerning the unit's troubled history. Failure of Advan-

tage employees to ascertain the subject temperature controller's history, at the very least, constituted a reckless disregard for the truth of the representations made to Mr. Price.

setts cases in which the "courts have found inducement to purchase goods of 'dubious reliability for the intended purpose' a violation of Chapter 93A" and "[d]elivery of a defective product without revealing the defects, to the extent they are known and material' also a violation of Chapter 93A." *Saint–Gobain,* 246 F.3d at 73 (citations to quoted case and internal citation omitted). Advantage sold a defective temperature controller to Mr. Price for use in an industry where product failure could lead to catastrophic consequences and induced Mr. Price to make such purchase by misrepresenting the history of the subject temperature controller, which I find was done for the purpose of concealing that the product had not performed properly while in service. Courts assessing potential liability under Chapter 93A have struggled to define what conduct constitutes "an unfair or deceptive act" for purposes of Chapter 93A. However, I have no hesitation in finding the unscrupulous conduct of Advantage in this case to be a violation of Chapter 93A.

I have determined that Advantage engaged in unfair and deceptive acts and practices when selling the subject temperature controller to PolyCarbon. However, such a finding does not compel a conclusion that Advantage is liable to Mr. Flory under Chapter 93A. Mr. Flory must still establish that a defect in the subject temperature controller caused the explosion. *Shepard's Pharmacy, Inc. v. Stop & Shop Co's.,* 37 Mass.App.Ct. 516, 640 N.E.2d 1112 (1994)(to prevail on Chapter 93A claim, plaintiff must show causal connection between defendant's unfair and deceptive act and damage suffered and that such damage was reasonably foreseeable). In other words, Mr. Flory must establish causation. As stated previously, I am not bound by the jury's determination that Mr. Flory failed to prove that a defect in the subject temperature controller caused the explosion. *See Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1066 (1st Cir.1985). Having listened to the evidence presented by the parties and having weighed the testimony and the credibility of the witnesses, including the parties' respective experts, I find that Mr. Flory established by a preponderance of the evidence that the subject temperature controller was the sole cause of the explosion and that the injuries sustained by him were a reasonable and foreseeable consequence of Advantages having sold a defective temperature controller to PolyCarbon.

### B. *Assessment of Mr. Flory's Damages*

As outlined above, I find by a preponderance of the evidence that: the subject temperature controller sold by Advantage to PolyCarbon was defective; Advantage knew it was defective at the time of the sale and made misrepresentations to Mr. Price concerning the history of said subject temperature controller for the purpose of concealing the fact that it was defective; and, contrary to the jury's finding, the explosion that caused serious injuries to Mr. Flory was caused by defects in the subject temperature controller. Having found that Advantage violated Chapter 93A and that its unfair acts or practices were the cause of Mr. Flory's injuries, this Court must now determine the amount of damages to which Mr. Flory is entitled.

■ Mr. Flory incurred lost wages of approximately $15,330 and reasonable and necessary medical expenses in the amount of $9,729.65. Furthermore, Mr. Flory has suffered permanent physical scarring on his hand and ear. Additionally, Mr. Flory has suffered and continues to suffer severe emotional distress. For example, Mr. Flory was compelled to change his career as a result of emotional trauma related to the explosion. Although I have determined that Mr. Flory's evidence concerning lost

future earnings is speculative and, therefore, decline to award damages for such loss, evidence concerning the reason for his leaving PolyCarbon to pursue a different career is evidence of the emotional pain and suffering which he has and continues to suffer since the explosion. Considering the totality of the emotional and physical injuries suffered by Mr. Flory together with medical expenses and lost wages, I am awarding Mr. Flory damages the amount of $260,000. The question now becomes whether Advantage's violation was willful and knowing, thus warranting an award of multiple damages.

■ Chapter 93A provides for up to three, but not less than two times, the amount of damages where the court determines that the defendant's violation was knowing or willful, or that refusal to grant relief "was made in bad faith with knowledge or reason to know that" that the defendant had engaged in an unfair or deceptive act or practice. Mass.Gen.L., ch. 93A, §§ 9(3), 11. In this case, I find that Advantage's conduct was knowing and willful. First, Advantage sold a defective unit to Mr. Price knowing that it was intended to be used in the chemical industry. In addition to misrepresenting the history of the subject temperature controller to Mr. Price, contrary to its own policy concerning returned units, Advantage made no attempt to repair and/or re-condition the subject temperature controller prior to shipping it to PolyCarbon. After the explosion and the commencement of this suit, Advantage attempted to conceal

the history of the defective subject temperature controller. During discovery, Advantage did not produce, when requested by the Plaintiffs, documentation that evidenced the return of the subject temperature controller by E.W.I. under warranty because it was defective. It was not until the Plaintiffs informed Advantage that they had obtained copies of these documents from E.W.I. that Advantage produced the previously requested documents. Considering the totality of the circumstances and Advantage's egregious actions which constituted a knowing and willful violation of Chapter 93A, I am awarding Mr. Flory double damages.[3]

### C. *Attorneys' Fees and Costs*

Since I have determined that Advantage violated Chapter 93A, Mr. Flory shall "in addition to other relief provided for ... and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action." Mass.Gen.L. ch. 93A, § 11. Plaintiffs in this case have incurred a total of $263,820.50 in legal fees and $46,879.19 in costs and expenses. *See Affidavit of Kevin G. Kenneally, Esq. (Ex.47)*; *Supp. Affidavit of Fees and Expenses by Kevin G. Kenneally, Esq.*, (Docket No. 173). However, in addition to Mr. Flory's Chapter 93A claim, this action involved multiple common law tort and warranty claims as to which the jury found against the Plaintiffs. Mr. Flory is entitled to recover only those costs/expenses and attorney's fees

---

**3.** Mr. Flory also asserts that he is entitled to treble damages based on Advantage's failure to timely respond to his demand letter and settle this case. Mr. Flory argues that this failure was in bad faith since Advantage knew that it had sold PolyCarbon a defective unit which was the cause of the explosion that injured him. Advantage failed to respond to Mr. Flory's demand letter until the eve of trial, over four years after receipt of the letter.

Furthermore, the initial offer of $90,000 by Advantage was less than realistic considering Mr. Flory's injuries. On the other hand, there were allegations that Advantage did not timely receive all of Mr. Flory's medical information. Furthermore, I cannot find that the delay in responding to Mr. Flory's demand letter and an initial low offer necessarily constituted bad faith warranting the award of multiple damages against Advantage.

attributable to his Chapter 93A claim. I will now determine that amount.

In determining the amount of attorney's fees and costs/expenses to be assessed in a Chapter 93A case, the court should consider:

> The nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.

*Refuse and Environmental Systems, Inc. v. Industrial Services of America, Inc.,* 932 F.2d 37, 45 (1st Cir.1991).

No single factor is necessarily dispositive of the services' worth and ultimately, the "fee shifting anodyne focuses on 'what [counsel's] services were objectively worth.'" *Arthur D. Little Int'l., Inc. v. Dooyang Corp.,* 995 F.Supp. 217, 221 (D.Mass.1998).

### The Results Obtained; The Nature of the Case

This was essentially a products liability case arising out of an explosion which resulted in severe injuries to Mr. Flory. The Plaintiffs asserted common law claims and Mr. Flory asserted a Chapter 93A claim against multiple defendants for breach of warranty, negligence and loss of consortium. Like Mr. Flory's Chapter 93A claim, Plaintiffs' common law claims were all based on injuries sustained by Mr. Flory as a result of the October 21, 1997 explosion at PolyCarbon. All of these claims (*i.e.,* Mr. Flory's Chapter 93A claim and the Plaintiffs' common law claims) involved essentially the same underlying facts and legal analysis. Additionally, the experts engaged by the Plaintiffs to investigate the circumstances of the explosion, to render reports and/or to testify at trial were relevant to both Plaintiffs' common law claims and Mr. Flory's Chapter 93A claim. Prior case law recognizes that "[a]s a rule, when a single chain of events gives rise to both a common law and a Chapter 93A claim, apportionment of legal effort between the two claims is not necessary." *Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.,* 849 F.Supp. 820, 826 (D.Mass.1994) (citing *Simon v. Solomon,* 385 Mass. 91, 112, 431 N.E.2d 556 (1982)), *rev'd on other grounds,* 44 F.3d 40 (1st Cir.1995); *see also DiMarzo v. American Mutual Ins. Co.,* 389 Mass. 85, 449 N.E.2d 1189 (1983). "In fact, 93A claims are typically based on an underlying common law claim and attorneys' fees may be assessed for all phases" of litigation. *Arthur D. Little Intern., Inc. v. Dooyang Corp.,* 995 F.Supp. 217, 222 (D.Mass.1998) (citations omitted).

I find that substantially all of the facts and legal analysis developed at trial were necessary to support both the Plaintiffs' common law claims and Mr. Flory's Chapter 93A claim. At the same time, Plaintiffs' common law claims and Mr. Flory's Chapter 93A claim were based on several different theories of liability as to which they/he did not prevail, including: loss of consortium, breach of warranty for a particular purpose, breach of an express warranty, and breach of warranty/negligence for failure to provide adequate warnings. Furthermore, the costs/expenses and attorney's fees for which Mr. Flory seeks reimbursement include amounts incurred in pursuing his claims against Durakool, which was dismissed prior to trial. Mr. Flory is entitled only to costs and attorney's fees relating to his Chapter 93A claim against Advantage based on Advantage's sale to PolyCarbon of a device which contained a manufacturing defect, including misrepresentations made by Advantage in connection with that sale. I find that the costs/expenses and attorney's fees

incurred by Mr. Flory's relating to this claim against Advantage comprise approximately one-half of the total costs/expenses and attorney's fees incurred by the Plaintiffs in this action. Therefore, as an initial determination, I find that Mr. Flory may recover, at most, one half of the costs/expenses and attorneys' fees incurred by the Plaintiffs, or $160,349.85. I will now determine whether this amount should be further adjusted in light of other relevant factors.

### The Time and Labor Required; Complexity of the Case

The prosecution of this case was frustrated by Advantage, since it failed to timely produce requested documents that clearly demonstrated that the subject temperature controller had been previously in industrial use, did not work, was returned on warranty as being defective and was never repaired prior to being sold to Mr. Price. Products liability cases are complex and require a great deal of investigation through requests for documents, depositions and development of facts independent of the normal discovery tools available to litigants. Additionally, products liability cases require the hiring of experts who are expensive and who deal with complicated issues, not normally understood by lay persons. Therefore, I conclude that this was a complex case that required a great deal of time and labor to develop and to take to trial.

### Experience, Reputation and Ability of Counsel

Plaintiffs' counsel has submitted time sheets detailing services they performed on behalf of the Plaintiffs. Mr. Kenneally, Mr. Flory's principal lawyer, who performed most of the work, charged $205.75 an hour while a partner at Burns & Levinson. After Mr. Kenneally left Burns & Levinson for Donovan & Hatem, which was for most of the period that he performed services for Plaintiffs in this case, he charged $275.00 an hour. Associates were billed at $160.00 and $100.00 an hour while at Burns & Levinson and paralegals charged $50.00 or $65.00 an hour. Associates at Donovan & Hatem charged $165.00 an hour and paralegals charged $85.00 an hour.

Advantage's counsel objects to these amounts and Advantage's lead counsel states in an affidavit, that both Burns & Levinson and Donovan & Hatem are "insurance defense" firms and as such, are required to charge low hourly rates for this type of legal service. *See Affidavit of Scott Mechanic Concerning Advantage Engeering's, Inc.'s Opp. To Pls' Fee Pet.* (Docket No. 172). Mr. Mechanic represents that as an insurance defense lawyer, he is being paid $135.00 an hour in this case. Mr. Mechanic then opines that $200.00 an hour for Mr. Kenneally's services is a more realistic figure. I disagree. First, Mr. Kenneally and his firm(s) were representing the plaintiffs in this case and not an insurance defendant. Second, Mr. Kenneally is an experienced, well respected trial lawyer. Third, this was a complex products liability case which required a great deal of investigation, preparation and time obtaining, working with and presenting expert testimony. Almost ten years ago, as a trial lawyer in Worcester, I charged $225.00 to $250.00 an hour, and at that time, was aware that other lawyers who did similar work charged a similar amount. I have presided over a number of cases in this Court of equal to and lesser complexity to this case and find that the hourly rates charged by Mr. Kenneally and his firm(s) are similar to the rates charged by other attorneys/firms in the area. Therefore, I find that a charge of $275.00 an hour for an experienced trial

310

lawyer in a products liability case tried in Worcester to be a reasonable fee. Similarly, I also find that the charge from $100.00 to $165.00 an hour for an associate is reasonable, as is the charge from $50.00 to $85.00 an hour for a paralegal. I further note that the total amount charged by paralegals in this case was less than $2,000.00 and that the bulk of the services rendered in this case on behalf of the plaintiffs were performed by Mr. Kenneally.

### The Amount Of Damages Involved

As stated previously, this case involved an explosion which resulted in severe injuries to Mr. Flory, including significant pain and suffering and emotional distress. I have awarded Mr. Flory damages in the amount of $260,000, which I have doubled. Given the significant award in this case and the other factors which I have considered, I find $160,349.85 to be a reasonable award of costs/expenses and attorney's fees in this case.

### Conclusion

1. Motion By Plaintiffs Brian Flory and Linda Flory For Judgment As A Matter Of Law Pursuant To Rule 50 After Trial And/or Motion For New Trial (Docket No. 166) is *denied.* Judgment shall enter for the Defendant, Advantage Engineering, Inc. on Counts I, II, VII, of Plaintiffs' Amended Complaint.

2. Judgment shall enter for Mr. Flory on Count III of the Amended Complaint in the amount of $520,000, together with costs and attorney's fees in the amount of $160,349.85.